**BANCO PORTUGUES do ATLANTICO, Plaintiff,**

v.

**ASLAND, S.A., Logostable, N.V., Obanos Minerals, N.V., Joaquin de Navasques, Joaquin Bertran, Miguel Del Campo, Alberto Vinolas and Joaquin Targhetta, Defendants.**

No. 89 Civ. 4970 (RJW).

United States District Court, S.D. New York.

Sept. 18, 1990.

Cleary, Gottlieb, Steen & Hamilton, New York City (Thomas J. Moloney, Frank L. Eppes, Linda A. Hiniker, of counsel), for plaintiff.

Baker & McKenzie, New York City (Lawrence W. Newman, Charles Cummings, of counsel), for defendant Asland, S.A.

## OPINION

ROBERT J. WARD, District Judge.

Plaintiff Banco Portugues do Atlantico ("the Bank") has moved, pursuant to Rule 56, Fed.R.Civ.P., for summary judgment against defendant Asland, S.A. ("Asland") with respect to the first cause of action in plaintiff's amended complaint, and for entry of a final judgment as to that claim pursuant to Rule 54(b), Fed.R.Civ.P. For the reasons that follow, the motion for summary judgment is granted, and the motion for entry of a final judgment is denied.

## BACKGROUND

In this lawsuit, the Bank seeks to recover money it advanced to various companies to fund the mining operations of the Sugarloaf Mine in Arkansas. The action was originally filed in state court, and was removed to this Court pursuant to 28 U.S.C. §§ 1331 and 1341 after amendment of the original complaint to add three claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO"). The instant motion concerns only one aspect of a series of somewhat complex transactions by which the loans at issue in the instant case were effected and guaranteed by various parties.

Except where otherwise noted, the following facts are not disputed. On February 12, 1986, the Bank entered into a Security and Loan Agreement (the "Loan Agreement") with Koal Industries International, Inc. ("KII"), European Energy Corporation ("EEC"), Sugarloaf Mining Corporation ("SMC"), Daylight Holdings, Inc. ("DHI"), Asland,[1] and certain other companies not

---

1. Asland, a corporation organized under the   laws of Spain, was at the time of these transac-

involved in the instant motion.[2] Pursuant to the Loan Agreement, the Bank agreed to make certain loans to KII and DHI (the "Term Loans"). In addition, the Loan Agreement provided for the execution of certain other agreements prior to or contemporaneous with the making of the Term Loans. Among these other agreements were a Revolving Credit Agreement between the Bank and EEC (the "Revolving Credit Agreement"), a Revolving Credit Guarantee executed by certain companies, including Asland (the "Guarantee"), a Purchase Agreement between Asland and EEC (the "Purchase Agreement"), and a Distribution Agreement among the Bank and KII, EEC, SMC and DHI (the "Distribution Agreement") providing for the distribution by the Bank of amounts assigned to it under the Loan Agreement.

The Bank and EEC entered into the Revolving Credit Agreement on March 14, 1986, under which the Bank granted EEC a revolving line of credit in the amount of $1,900,000.[3] As set out in the Revolving Credit Agreement, this line of credit was made available to EEC for the purpose of paying the costs of mining, inspection, transportation and delivery of the coal marketed by it prior to payment for the coal by its ultimate purchaser, Asland.[4] Section 1.2 of the Revolving Credit Agreement, entitled "Availability," provides:

> Each loan shall be in a principal amount of not less than $25,000, and shall be made by the Bank to the Borrower [EEC], provided that the Borrower delivers a notice in the form of the Notice of Drawing attached as Schedule A hereto ..., fixing a date ... and otherwise containing the representations required by

such schedule. Each Loan shall be made in respect of a specific shipment of coal or other minerals duly delivered to a barge carrier for shipment....

Exh. A to Affidavit of Sergio Capela, filed February 14, 1990 ("Capela Aff."). The Notices of Drawing required the following items to be provided with respect to the particular shipment of coal: (1) the applicable purchase contract; (2) the date of loading; (3) the barge number; (4) tonnage in metric tons; and (5) the price per ton.

Section 4.1, entitled "Conditions of Borrowing," further provided that the Bank's obligation to make advances under the contract would be subject to certain conditions precedent, including that EEC provide, "as to each advance, an appropriately completed and executed Notice of Drawing," and that the "form and substance of ... each Notice of Drawing ... shall be satisfactory to the Bank and its counsel." *Id.*

The Guarantee, also dated as of March 14, 1986 and signed by Asland as well as certain other defendants not involved in the instant motion, provides that, in order to induce the Bank to furnish a line of credit to EEC under the Revolving Credit Agreement,

> each Guarantor hereby unconditionally and irrevocably guarantees to the Bank ... the prompt and complete payment when due (whether at the stated maturity, by acceleration or otherwise) an amount equal to such Guarantor's Guarantee Percentage of all indebtedness, obligations and liability of EEC under the Line of Credit....

Exh. C to Capela Aff. The Guarantee Per-

---

tions the owner of forty percent of EEC, with an option to purchase an additional ten percent. In addition, three of the six members of the EEC Board of Directors were appointed by Asland.

**2.** This agreement was amended by a signed writing on March 14, 1986, in respects not relevant to this decision.

**3.** Pursuant to this agreement, EEC also signed a promissory note in favor of the Bank in the amount of $1,900,000 (together with the Revolving Credit Agreement, the "Line of Credit").

**4.** Pursuant to the Purchase Agreement entered into by Asland and EEC on February 12, 1986 and amended by a writing signed by both parties on March 14, 1986, Asland agreed to purchase from EEC 300,000 metric tons of coal per year, for a period of five years, at a price no lower than the sum of all mining, transportation and shipping costs, and "all principal and interest payments payable to [the Bank]." Exh. 1 to Declaration of Miguel Del Campo, filed April 14, 1990 ("Del Campo Decl.").

centage of Asland is forty percent.[5]

Between April and August, 1986, the Bank made a total of 37 advances to EEC under the Revolving Credit Agreement, pursuant to Notices of Drawing which were complete in all respects. Beginning at the end of August, 1986, however, and for approximately four months thereafter, advances were made by the Bank to EEC pursuant to Notices of Drawing which, in place of the "Barge number" and "Date of Loading" information, stated that this information was "to be announced." The parties disagree about the extent to which such information was subsequently furnished to the Bank, and about the degree of diligence with which the Bank attempted to fill in the blanks left by EEC. In addition, Asland points to a series of "remarkable coincidences" with respect to the amounts of coal purportedly loaded onto barges as reported in these later Notices of Drawing which, according to Asland, either did or should have alerted the Bank that the information contained therein was false.[6] It is apparently undisputed that some amount of coal for which the Bank made advances to EEC pursuant to the Notices of Drawing was not in fact delivered to Asland, although the exact degree of the discrepancy is disputed.

In or about July 1986, the Bank informed all parties involved that substantial Term Loan installments would become due on September 15 of that year and that it was important to the Bank that these installments be paid. According to Asland, at a meeting held in July the Bank informed both Asland and Earl Powers of EEC that "if two cargoes of coal could be shipped to Spain and paid for before the September 15 deadline, sufficient revenue would be produced to pay all debts due to [the Bank]."

Affidavit of Miguel Del Campo, filed April 13, 1990, ¶ 8 ("Del Campo Aff."). However, it soon became apparent that only one shipment of coal could be shipped to Spain prior to the installment date. Thus, Asland asserts that it agreed, in order "to help solve the problem," to make a partial payment for the second shipment of coal in advance of its shipment date, provided that sufficient coal had been mined to cover the advance payment. Asland states that it made this advance payment "on the understanding that those funds would be used to reduce or pay the amounts due under the Term Loans," and that it also "understood" that the payment for the first shipment of coal, along with the advance payment for the second shipment, would suffice to pay the total debt then due the Bank, including the balance due under the Revolving Credit Agreement. *Id.* at ¶¶ 8–10.

On September 12, 1986, Asland paid ninety percent of the invoice amount (as per the usual practice of the parties) for the first shipment of coal, amounting to $1,145,-039.85. Several days later, Asland was informed by an official of the Bank that an advance payment of $675,000 would be needed with respect to the second shipment in order to pay the balance of the term loan installments. *Id.* at ¶ 9. On October 8, 1986, Asland paid the remaining ten percent due on the first shipment, or $127,-226.65, as well as the $675,000 advance payment on the second shipment as previously agreed. According to Miguel Del Campo, the Director General of Asland, defendant "understood that by these payments the total debt due to [the Bank]—including the balances due under the Revolving Credit Agreement—had been paid." *Id.* at ¶ 10.

5. The Guarantee also provides that:

the Guarantor further agrees to pay an amount equal to such Guarantor's Guarantee Percentage of any and all expenses (including attorneys' fees) (the "Expenses") which may be paid or incurred by the Bank in collecting any or all of the Obligations and/or enforcing any rights under this Guarantee or under the Obligations.

*Id.*

6. Defendant points out that among the twenty-two Notices of Drawing which failed to report the barge number and date of loading information, there are four instances in which two Notices of Drawing request advances for deliveries of identical quantities of coal. In addition, defendant argues that the amounts of coal for which advances were requested in these "nonconforming" Notices of Drawing were in many instances much larger than the amounts that had previously been loaded.

A close reading of the Del Campo Affidavit reveals that this alleged "understanding" was based upon Asland's pre-existing "understanding" of the purpose and operation of the Revolving Credit Agreement. Del Campo states that the Bank "did not allocate the money it received from Asland [in September and October of 1986] in the manner in which it had agreed." Del Campo Aff. at ¶ 12. Although he points to no specific or separate agreement occurring at the time the advance payment for the second shipment was made, Del Campo asserts that the Bank and EEC "were careful not to alert Asland to [the Bank]'s deviation from the allocation formula presented to Asland in February and March 1986, or from the Distribution Agreement...." *Id.* at ¶ 13. February and March 1986 was the time at which the Revolving Credit Agreement and the other relevant agreements were signed by the parties. Thus, it appears that Asland's position is that the Bank failed to act in accordance with its obligations under the Revolving Credit Agreement in allocating the September–October payments.

In any event, the payments made in September and October 1986 were not in fact sufficient to repay both the Term Loan installments and the Revolving Credit advances which remained unpaid. After satisfying the Term Loan payments due, the Bank repaid several Revolving Credit advances pursuant to the directions of EEC, however there remained unpaid a significant sum under the Revolving Credit Agreement.

On July 27 and August 5, 1987, plaintiff demanded payment from EEC, Asland, and certain other guarantors of the allegedly outstanding Revolving Credit obligations of EEC. To date, no payment has been made on these obligations. The Bank seeks summary judgment on its claim that Asland is liable, under the Guarantee, for its share of the outstanding Revolving Credit advances made by the Bank to EEC.

## DISCUSSION

The standards for granting summary judgment in this Circuit are well-estab-lished. A court may grant this extraordinary remedy only when it is clear both that no genuine issue of material fact remains to be resolved at trial and that the movant is entitled to judgment as a matter of law. Rule 56, Fed.R.Civ.P. In deciding the motion, the Court is not to resolve disputed issues of fact, but rather, while resolving ambiguities and drawing reasonable inferences against the moving party, to assess whether material factual issues remain for the trier of fact. *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–50, 106 S.Ct. 2505, 2509–11, 91 L.Ed.2d 202 (1986)). Only where the entire record would inevitably lead a rational trier of fact to find for the moving party is summary judgment warranted. *National Railroad Passenger Corp. v. City of New York*, 882 F.2d 710 (2d Cir.1989).

Although the party seeking summary judgment bears the burden of demonstrating the lack of material factual issues in dispute, *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 9 (2d Cir.1983), "the mere existence of factual issues—where those issues are not material to claims before the court—will not suffice to defeat a motion for summary judgment." *Quarles v. General Motors Corp.*, 758 F.2d 839, 840 (2d Cir.1985) (per curiam).

It is clear that the movant faces a difficult burden to succeed, however motions for summary judgment, properly employed, permit a court to terminate frivolous claims and defenses, and to concentrate its resources on meritorious litigation. *Knight v. U.S. Fire Ins. Co., supra*, 804 F.2d at 12. The motion then:

is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." Fed.Rule Civ. Proc. 1.... Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have

those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis. *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986).

Plaintiff asserts that EEC has defaulted on its obligations under the Revolving Credit Agreement, that due demand for payment has been made both upon EEC and upon Asland, and that Asland is therefore liable to the Bank for its Guarantee Share under the Guarantee. According to plaintiff, since none of these factual issues are in dispute, summary judgment on this claim is warranted.

Defendant does not dispute the fact that it signed the Guarantee. Rather, defendant's principal argument in response to plaintiff's motion is that, because of the above-described "nonconforming" Notices of Drawing, the advances made by the Bank to EEC were not made "under" the Revolving Credit Agreement and therefore are not a part of the obligations of EEC which were guaranteed by it under the terms of the Guarantee. Defendant further argues that, with respect to advances made for coal which was not in fact shipped to Asland, it is not liable under the Guarantee. Finally, it is defendant's position that plaintiff misallocated the payments made by Asland in September and October of 1986, and that plaintiff was required to use those payments first to cover any outstanding obligations of EEC under the Revolving Credit Agreement. Thus, in effect, defendant's argument is two-pronged: (1) that the Guarantee does not cover the obligations in question because the loans were made "outside" the Revolving Credit Agreement since they were not made "in respect of a specific shipment of coal;" and (2) that in any event nothing is owed by EEC under the Revolv-

ing Credit Agreement because Asland paid for all coal actually shipped to it by EEC, and those payments should immediately have been used by the Bank to cover all outstanding obligations of EEC under the Revolving Credit Agreement. The Court will address each of these arguments in turn.

## I. *The Alleged Deviations from the Revolving Credit Agreement.*

■ Under New York law,[7] "[a] surety or guarantor is not liable for moneys owed by his principal to the creditor on a contract other than the contract guaranteed...." 63 N.Y. Jur.2d, Guaranty and Suretyship § 113 (1987) (citing *American Rattan & Reed Mfg. Co. v. Cone,* 198 A.D. 843, 190 N.Y.S. 782 (1921); *Orange Front Paint Supply, Inc. v. Levy,* 34 Misc.2d 2, 212 N.Y.S.2d 207 (Sup.Ct.1961)). This proposition is consistent with the principle, followed in New York, that the obligations of a guarantor or surety are construed *strictissimi juris,* and that "the court must protect the surety against a liability which is not strictly within the terms of the contract [of suretyship]." *People v. Stuyvesant Ins. Co.,* 98 Misc.2d 210, 413 N.Y.S.2d 843, 846–47 (Sup.Ct.1979); *Cinerama, Inc. v. Sweet Music, S.A.,* 355 F.Supp. 1113, 1119 (S.D.N.Y.1972), *rev'd in part on other grounds,* 482 F.2d 66 (2d Cir.1973), *and aff'd without op.,* 493 F.2d 1397 (2d Cir. 1974).

However, the rule of *strictissimi juris* requires only that, after the meaning of the contract of guarantee has been determined according to the ordinary principles of contract construction, the obligations undertaken by the guarantor are to be strictly applied. *Id.* 413 N.Y.S.2d at 847 (citing cases). Thus, while "[t]he liability of a surety cannot be extended beyond the plain and explicit language of the contract ..., a surety is not entitled to any particular tenderness in the interpretation of the lan-

---

7. The Guarantee provides that "[t]his Guarantee shall be governed by and be construed and interpreted in accordance with the laws of the State of New York (without giving effect to the choice of law provisions thereof)." Exhibit C to Affidavit of Sergio Capela ("Capela Aff.") at 6,

¶ 14. Such a choice of law clause in a guarantee contract is enforceable. *See Chemical Bank v. Layne,* 423 F.Supp. 869, 871 (S.D.N.Y.1976); 63 N.Y.Jur.2d, Guaranty and Suretyship § 8 (1987).

guage of the contract." 63 N.Y.Jur.2d, Guaranty and Suretyship § 89 (1987).

■ In the instant case, the language of the Guarantee regarding the scope of the guarantors' undertakings is plain and un-ambiguous. The Guarantee provides that, in order to induce the Bank to extend credit to EEC:

> each Guarantor hereby unconditionally and irrevocably guarantees to the Bank ... the prompt and complete payment when due ... an amount equal to such Guarantor's Guarantee Percentage of all indebtedness, obligations and liabilities of EEC under the Line of Credit, wheth-er now existing or hereafter incurred, whether matured or not matured, direct or indirect, contingent or absolute, se-cured or not secured, whether for princi-pal, interest, fees, expenses or other-wise....

Exhibit C to Capela Aff. at 1, ¶ 1. The "Line of Credit" is defined earlier in the same paragraph as that credit extended by the Bank to EEC "pursuant to the Revolv-ing Credit Agreement, ... (together with the promissory note issued pursuant there-to....)" *Id.* Thus, to determine whether Asland is liable as a Guarantor for the obligations of EEC at issue herein, the Court must first address the question whether these advances were "extend[ed] to [EEC] pursuant to the Revolving Credit Agreement."

Asland argues that the purpose of the Revolving Credit Agreement is to provide bridge financing for the sale of coal by EEC, that this purpose is "reflected in the limitation on [the Bank]'s ability and obli-gation to make such loans in Paragraph 1.2 of the Revolving Credit Agreement,"[8] and that the requirement that the loans be sup-ported by Notices of Drawing containing certain specified information is intended "to enforce this limitation." Defendant's

Rebuttal Memorandum of Law, filed April 20, 1990, at 3. Based upon these asser-tions, defendant concludes that the failure of EEC to specify the dates of loading and barge numbers of certain shipments of coal in the Notices of Drawing rendered any loans made pursuant to those faulty No-tices of Drawing beyond the purpose of the Revolving Credit Agreement and thus "out-side" the Revolving Credit Agreement and, consequently, the Guarantee.

In responding to defendant's argument on this point, plaintiff assumed that Asland was attempting to assert a defense to the Guarantee based upon alteration of the un-derlying loan contract.[9] Under New York law, it is well-settled that "[w]hen the terms of the contract guaranteed have been changed or the contract, as finally made, is not the one upon which the surety agreed to become bound, he will be re-leased." *Smith v. Molleson,* 148 N.Y. 241, 42 N.E. 669 (1896); *Lincoln Savings Bank v. Murphy's Deluxe Limousine Service, Inc.,* 556 N.Y.S.2d 102, 103 (App.Div.1990) ("[a]lteration of the contractual obligation of the principal releases the surety").

However, as plaintiff points out, it is also clear that the guarantor or surety may consent in advance, in the contract of guar-antee, to modification of the underlying contract. *See National Westminster Bank, U.S.A. v. Ross,* No. 86 Civ. 6277, slip op., 1988 WL 96032 (S.D.N.Y. August 29, 1988) (available on Lexis at 1988 U.S. Dist. LEXIS 9562) (granting, on reargument, plaintiff's motion for summary judgment on guarantee, where contract of guarantee contained consent to modification); *Walter E. Heller & Co. v. Cox,* 343 F.Supp. 519, 527 (S.D.N.Y.1972), *aff'd sub nom Walter E. Heller & Co. v. Ocean Air Tradeways,* 486 F.2d 1398 (2d Cir.), *cert. denied,* 414 U.S. 827, 94 S.Ct. 46, 38 L.Ed.2d 61 (1973).

---

8. As noted above, that paragraph provides, in part, that:

> Each Loan shall be made in respect of a specific shipment of coal or other minerals duly delivered to a barge carrier for shipment and shall not exceed an amount equal to $25.05 multiplied by the number of metric tons of such shipment.

Exh. A to Capela Aff. at 3, ¶ 1.2.

9. This assumption on plaintiff's part was entire-ly reasonable as Asland cited no legal authority in support of its argument that it was not liable under the Guarantee based upon the noncon-formity of the Notices of Drawing.

The contract of guarantee executed by defendant contains the following consent clause:

> 4. *Obligations Absolute.* The obligations of each Guarantor under this Guarantee shall be absolute and unconditional and shall remain in full force and effect until all the Obligations [10] plus all the Expenses shall have been paid in full or fully performed and until such payment or performance shall have been made shall not be affected, modified or impaired upon the happening from time to time of any event, including, without limitation, any of the following, notwithstanding the lack of any notice to, reservation of rights against or further assent of any Guarantor:
>
> .    .    .    .    .
>
> (e) the modification or amendment (whether material or otherwise) of any of the Obligations, or the terms of any other guarantee, the Loan Agreement, the Line of Credit, or any Other Agreement. . . .

Exh. C to Capela Aff. at 3, ¶ 4(e).[11] Based upon this contractual language, plaintiff asserts that Asland has consented to any alleged modification in, or alteration of, the terms of the Revolving Credit Agreement and that any nonconformity in the Notices of Drawing therefore does not act to release Asland from its obligations as guarantor of that agreement.

Defendant's assertion that this consent clause is inapplicable because the advances made by the Bank to EEC pursuant to the deficient Notices of Drawing constitute some separate agreement, rather than a modification of the Revolving Credit Agreement, must be rejected. A review of the relevant New York case law demonstrates that defendant's implicit distinction between an "alteration" of a guaranteed contract on the one hand, and a "new" contract wholly outside of the guaranteed contract on the other, is analytically unsound. Instead, every modification which operates to release a guarantor does so precisely *because* it creates a "new" or "different" contract which alters the guarantor's undertaking.

■ The New York Court of Appeals has recently explained the circumstances under which a surety may be discharged by an alteration of the guaranteed contract. The court stated that:

> the creditor and the principal debtor may not alter the surety's undertaking to cover a different obligation without the surety's consent. If they do so the surety is discharged because the parties have substituted a new contract, to which it never agreed, for the original. . . . An obligation is altered when the debtor is discharged from the original contract and a new contract is substituted in its place.

*Bier Pension Plan Trust v. Estate of Schneierson,* 74 N.Y.2d 312, 546 N.Y.S.2d 824, 826, 545 N.E.2d 1212 (1989). It follows from this reasoning that deviations by the principal debtor and the creditor from the terms of the guaranteed contract,

---

10. The Guarantee defines the term "Obligations" as "all indebtedness, obligations and liabilities of EEC under the Line of Credit. . . ." *Id.* at 1, ¶ 1.

11. Other relevant subparagraphs of ¶ 4 provide that the obligations of the Guarantors shall not be affected by:

> (b) the invalidity, irregularity, unenforceability or termination (whether by reason of any default thereunder, surrender thereof, or otherwise), in whole or in part, of the Loan Agreement, the Line of Credit, any Other Agreement or any other Agreement executed in connection therewith;
>
> .    .    .    .    .
>
> (f) the taking or the omission of any of the actions referred to in this Guarantee, any other guarantee, the Loan Agreement, the Line of Credit or any other agreement;
>
> (g) any failure, omission or delay on the part of the Bank to enforce, assert or exercise any right, power or remedy conferred on the Bank in this Guarantee, the Loan Agreement, the Line of Credit or any Other Agreement, or any other act or acts on the part of the Bank or its respective successors, endorsees, transferees or assigns;
>
> .    .    .    .    .
>
> (j) the default or failure of any Guarantor or EEC fully to perform any of their respective obligations set forth in this Guarantee, any other guarantee, the Loan Agreement, the Line of Credit or any other agreement. . . . *Id.* at 3–4.

which have the effect of altering the surety's obligation, place the altered transactions "outside" the original contract, thereby discharging the surety.

■ However, as noted above, a surety is not discharged from its obligation unless its undertaking has been altered without its consent; and under New York law a surety may consent in advance to alterations in the underlying contract. The question for the Court in this case, then, is not whether the alleged modification has created a separate contract such that the consent provision is irrelevant,[12] but instead whether the scope of the consent given is sufficiently broad to encompass the change at issue. *See National Westminster Bank, U.S.A. v. Ross*, No. 86 Civ. 6277, slip op. (S.D.N.Y. August 29, 1988) (refusing to discharge guarantor where it was "clear that the modifications that took place were consistent with the consent clause").

Here, as in *National Westminster Bank*, it is quite clear that the modifications that took place were consistent with the terms of the consent clause. The consent clause is extremely broad, providing that "modification[s] or amendment[s] (whether material or otherwise)" to any of the relevant contracts including the Revolving Credit Agreement, shall not affect the liability of the guarantors. Further, the Guarantee also provides that:

> [t]his Guarantee shall be construed as a continuing, absolute and unconditional guarantee of payment ... without regard to any defense, setoff or counterclaim which may at any time be available to or be asserted by EEC against the Bank, or by any other circumstance whatsoever ... which constitutes, or might be construed to constitute, an equitable or legal discharge ... of any Guarantor under this Guarantee....

Exh. C to Capela Aff. at 4–5, ¶ 7. Based upon this unambiguous language, the

Court finds that no reasonable conclusion is possible other than that the advances made by the Bank upon Notices of Drawing which omitted certain information constituted an alteration of the terms of the contract which clearly fell within the scope of the consent provisions freely negotiated by defendant. *See Kidde, Inc. v. Stadium Management Corp.*, No. 87 Civ. 8936, slip op., 1988 WL 96169 (S.D.N.Y. August 26, 1988) (available on Lexis at 1988 U.S.Dist. LEXIS 9561) (granting summary judgment to plaintiff on guarantee containing similar language, on the ground that defendant had voluntarily and knowingly waived his right to assert equitable defense).

■ In its Rebuttal Memorandum of Law, filed April 20, 1990 ("Rebuttal Mem."), Asland asserts that, even if the loans at issue were made pursuant to the Revolving Credit Agreement and therefore fall under the terms of the Guarantee, the Bank has not demonstrated that it exercised any of the powers of modification or amendment conferred by the Guarantee. As the Court understands defendant's argument, it amounts to an assertion that the Guarantors' consent to alterations in, or modifications to, the Revolving Credit Agreement is inapplicable to the instant situation since plaintiff "does not contend if or when it ever did modify the Revolving Credit Agreement or what the terms of that modification were." Rebuttal Mem. at 13.

This argument merits little discussion. In the first place, it is apparent from all of the papers submitted in connection with plaintiff's motion that the modification at issue concerns the Bank's acceptance of the so-called "nonconforming" Notices of Drawing. Indeed, it was defendant which raised the matter initially, and it was only in response to defendant's doctrinally obscure argument that plaintiff assumed that defendant's defense sounded in alteration

---

**12.** The Court notes in this regard, however, that if there were no question of "alteration" or "modification," for example if the loans were made under a wholly distinct contract such as the Loan Agreement, then it would be apparent that a consent to *modification* would not apply. Under such circumstances, defendant's distinc-

tion between an "alteration" on the one hand, and a different contract on the other, would be more appropriate. However, where it is claimed that the alteration itself creates the new contract, this distinction, as noted above, is singularly unhelpful.

of the underlying contract. In any event, if the Revolving Credit Agreement was not in fact modified, then there would be no question of discharge of the guarantor, at least under an alteration defense.

Although defendant does not explicitly state an alternate theory of discharge in connection with the above argument, nor does it cite any cases, the argument might be made that although the changes in question did not amount to an alteration of the underlying contract, the behavior of the parties to that contract served to increase the surety's risk such that the surety became discharged from its obligation.

In *Smith v. Molleson,* 148 N.Y. 241, 42 N.E. 669 (1896), the New York Court of Appeals addressed a similar situation. There, the defendant surety claimed that it was discharged by reason of departures from the guaranteed construction contract, including the failure of the plaintiff to require a certificate prior to payment as provided in the contract. The court stated that:

> in this case there is no claim that the terms of the building contract, to which the defendant's bond related, have in any respect been changed by the parties to it. The most that is claimed is that, in its performance, the parties have so far departed from its terms as to change the defendant's condition, to her prejudice, and to deprive her of rights and benefits under the contract which, otherwise, she would be entitled to by subrogation. Where the party secured does some act which changes the position of the surety to his injury or prejudice, the latter is no longer bound.

*Id.*

An argument based upon this reasoning might be persuasive in the instant case if it were not for defendant's explicit waiver, in the Guarantee, of such a defense. *See, e.g., Key Bank of Long Island v. Munkenbeck,* 556 N.Y.S.2d 702, 703 (App.Div.1990) (rejecting defendants' allegation that they were released as guarantors because the plaintiff had impaired its collateral, since it was conclusory and unsubstantiated and, in any event, such a defense was waived by

the terms of the guarantees). As previously noted, defendant in the Guarantee agreed to be absolutely and unconditionally bound despite any circumstances "which constitute, or might be construed to constitute, an equitable or legal discharge ... of any Guarantor under this Guarantee." Exh. C to Capela Aff. at 4–5, ¶ 7. In addition, defendant explicitly agreed that its obligations under the Guarantee were not to be affected, modified or impaired by "the taking or the omission of any of the actions referred to in ... the Line of Credit," *id.* at 3, ¶ 4(f), "any failure, omission or delay on the part of the Bank to enforce, assert or exercise any right, power or remedy conferred on the Bank in ... the Line of Credit ..., or any other act or acts on the part of the Bank," *id.* at 3, ¶ 4(g), or "the default or failure of ... EEC fully to perform any of [its] ... obligations set forth in ... the Line of Credit." *Id.* at 4, ¶ 4(j).

■ In addition, it has been stated that, absent deception on the part of a lender of so great a magnitude that it amounts to non-disclosure fraud, *see Chemical Bank v. Layne,* 423 F.Supp. 869 (S.D.N.Y.1976), "conversion of the terms of a bank loan from safeguards for the lender into a shield for the guarantors will seriously disrupt important commercial needs and understandings." *Marine Midland Bank v. Smith,* 482 F.Supp. 1279, 1291 (S.D.N.Y. 1979), *aff'd without op.,* 636 F.2d 1202 (2d Cir.1980). *See also Trimline Window Frame, Inc. v. Rural New Yorker, Inc.,* 8 Misc.2d 645, 168 N.Y.S.2d 170, 172 (Sup.Ct. 1957) (provision in contract requiring approval in writing of terms of payment was for plaintiff's benefit only and could be waived by it); *Argonaut Ins. Co. v. Cloverdale,* 699 F.2d 417 (7th Cir.1983) (applying Indiana law and finding that although plaintiff did not observe certain requirements in the guaranteed contract, those requirements appeared to be for the plaintiff's protection and did not affect its rights against the surety). Particularly where, as here, the lender has reserved, in the guarantee, the power to refrain from exercising its rights under the guaranteed contract,

the terms in that contract inserted for the lender's benefit may not be used by the guarantor as a defense to the enforcement of the guarantee. *See Marine Midland Bank v. Smith, supra,* 482 F.Supp. at 1284.

■ Finally, Asland argues that even if the terms of the Guarantee would otherwise apply to preclude release of the guarantors, application of those terms is limited by a duty of good faith. Thus, Asland disputes what it characterizes as plaintiff's argument "that these boilerplate clauses give it unlimited discretion to administer the Revolving Credit loan as recklessly or as corruptly as it might, leaving Asland, as guarantor, unable to do more than pay on demand." Rebuttal Mem. at 12.

In the first place, there is absolutely no evidence in the record to suggest that the Bank administered the loan "recklessly" or "corruptly," nor did the Bank argue that it would have been entitled to do so. Defendant's contention that the series of "remarkable coincidences" in the amounts of coal purportedly loaded by EEC either did or should have alerted the Bank to allegedly false claims by EEC is insufficient as a matter of law to raise an inference of fraud or recklessness.

At most, defendant's allegations raise an inference of negligence on the part of the Bank; however, "any duty of care owed by plaintiff was owed exclusively to the borrower ... and not to defendant[ ]." *Citizens Fidelity Bank and Trust Co. v. Coulston International Corp.,* 553 N.Y.S.2d 901, 902 (App.Div.1990). *See also State v. Peerless Ins. Co.,* 67 N.Y.2d 845, 501 N.Y. S.2d 651, 652, 492 N.E.2d 779 (1986) (no

duty running from plaintiff State to surety such as would impose liability on plaintiff for negligence in continuing to sell to principal on credit and accepting uncertified checks as payment after several previous checks had been returned for insufficient funds); *State v. Peerless Ins. Co.,* 524 N.Y. S.2d 877, 880, 135 A.D.2d 143 (App.Div. 1988) ("[i]n the absence of any language in the bonds obligating the creditor to supervise a distributor, 'the surety bears the burden of making inquiries and informing itself of the relevant state of affairs of the party for whose conduct it has assumed responsibility' "); *Crompton–Richmond Co. v. Briggs,* 560 F.2d 1195, 1200 (5th Cir.1977) (applying New York law) (holding that under continuing, unconditional guarantee the surety waived any duty of care which the creditor might have owed him).[13]

There is evidence in the record that the Bank made advances to EEC, based upon false information in certain Notices of Drawing supplied by the borrower, for coal which was not in fact shipped to Asland. Defendant argues that it should not be liable under the Guarantee for any advances made by the Bank to EEC for coal which was not shipped. If this argument were accepted, the Guarantee would be largely meaningless.[14] As noted above, plaintiff was not required to police the activities of EEC. Rather, defendant, as guarantor, must be held liable for its principal's omissions or misdeeds. *Cf.* N.Y. Jur.2d, Guaranty and Suretyship § 174 (1987) ("Although the law requires a creditor to act in good faith toward a surety, the creditor is not held responsible for any deception practiced by the principal upon

---

**13.** Defendant's argument that plaintiff breached its duty to deal in good faith must likewise be rejected. Even if the actions of the Bank complained of by Asland were sufficient to raise a factual issue regarding bad faith, "no obligation [of good faith] can be implied ... which would be inconsistent with the other terms of the contractual relationship." *National Westminster Bank, U.S.A. v. Ross, supra,* No. 86 Civ. 6277, slip op. (quoting *National Westminster Bank, U.S.A. v. Ross,* 676 F.Supp. 48 (S.D.N.Y.1987)) (ellipses and brackets in original). The good faith duty owed by the Bank to Asland was a duty under the contract between those parties—

the Guarantee—and not under the Revolving Credit Agreement. Because the waiver and consent clauses of the Guarantee clearly permit the Bank to decline to enforce any of its rights and powers under the Revolving Credit Agreement, exercise by the Bank of that right may not be relied on by defendant as a basis of a claim of breach of plaintiff's duty of good faith. *Id.*

**14.** Under the Purchase Agreement, Asland was already obligated to pay, for all of the coal shipped, a price sufficient to allow EEC to repay all of the loans due the Bank. *See supra* n. 4.

the surety without the knowledge of the creditor ...").[15]

## II. The Alleged Misallocation of Funds.

■ Defendant contends that the Bank failed to credit certain funds received on behalf of EEC to loans outstanding under the Revolving Credit Agreement, instead using those payments to satisfy the Term Loan debt. According to defendant, this "misallocation" contravened the intent of the Revolving Credit Agreement as "understood" by Asland. Del Campo asserts that Asland's understanding of the operation of the Revolving Credit Agreement was that "as long as Asland paid for all the coal EEC shipped to it, nothing would be owed" under that agreement, since Asland believed that the purpose of the agreement was to provide bridge financing to EEC and that the advances made by the Bank in respect of each specific shipment of coal were to be immediately repaid upon payment by Asland for the specific shipment.

According to Asland, although it was not provided with copies of all of the agreements signed in February and March 1986 at the time that it signed the Guarantee, when it did eventually obtain copies of these other agreements—particularly the Distribution Agreement[16]—this understanding was confirmed as correct.

As is clear from the terms of the Distribution Agreement, however, the Bank retained the right to allocate funds as it chose in the event a default was threatened under the Loan Agreement. It is further clear that, by the explicit terms of the Distribution Agreement, Asland could claim no rights as a third party beneficiary to that contract. There is no dispute that the Bank allocated the funds as directed by EEC.

Were defendant's "understanding" of its obligations correct, the Guarantee would be largely meaningless as the Bank would be forced to bear the cost of any loans made for coal which was not in fact shipped to

15. Asland asserts that it was deceived as to the administration of the loan by EEC. Yet it is undisputed that Asland was a major shareholder of EEC, and had appointed three of its six directors. Under similar circumstances, a court in this district rejected the guarantors' claim of non-disclosure fraud by the creditor. See Marine Midland Bank v. Smith, 482 F.Supp. at 1288. The court stated:

Defendant-guarantors here are principals of the underlying borrower whose indebtedness they guarantee. [The borrower] was their partnership; they had a 40% equity interest in one of the two general partners; [the borrower]'s managers were their designees, partners and fellow principals and they cannot complain of the Bank that these individuals mismanaged their project or wasted their assets; they had the power to control [the borrower]; they knew or had the means of knowing its conditions at all times. In short, given the inherent nature of their relationship with the company to which they gave their unconditional guarantees, defendants cannot successfully contend that the Bank had a fiduciary duty toward them.

Id. See also Argonaut Ins. Co. v. Cloverdale, supra, 699 F.2d at 420 (finding that the guarantor could not avoid liability based on incorrect invoices where guarantor was in better position to avoid the events giving rise to the dispute).

16. The Distribution Agreement provides that, except in case of an event of default occurring or

being threatened, payments received by the Bank on behalf of EEC and the other parties to the agreement would be distributed in the following order of priority:

First, so much of such payment as shall be required to pay or reimburse the Bank for the amount of the Facility Fee in respect of the particular shipment of coal or other minerals for which such payment represents all or part of the purchase price (the "Applicable Shipment")....

Second, so much of such payment as shall be required to pay in full the principal of and all accrued interest on any loan made to EEC under the Revolving Credit Agreement with respect to the Applicable Shipment....

Del Campo Aff., Exhibit 3, at 5. The Distribution Agreement thereafter provides for six other applications of funds, not relevant here. Id. at 5-8.

However, where an event of default has occurred or is likely to occur with the passage of time, "the Bank shall have right [sic] to take, or refrain from taking, such action as it may deem necessary or desirable with respect to the Receivables." Id. at 9. Further, the Distribution Agreement specifically provides that it "is solely for the benefit of the respective parties [thereto] ... and no other person or persons shall have any rights, benefit, priority or interest under, or because of the existence of, this Agreement." Id. at 12. Asland is not a party to the Distribution Agreement.

Asland by EEC.[17] As discussed above, the guarantor, and not the Bank, must be responsible for nonperformance on the part of the principal. As plaintiff correctly points out, Asland's argument that it "agreed to guarantee partial repayment of the Revolving Credit debt because it understood it was merely guaranteeing its own performance" amounts to "a fundamental misconception of the very nature of a guarantee, which is an agreement that imposes on the guarantor the obligation of insuring the performance of another." Plaintiff's Reply Memorandum of Law, filed April 10, 1990, at 3.

Defendant does not otherwise dispute plaintiff's calculation of the amount owed it under the Revolving Credit Agreement. Accordingly, the Court rejects defendant's assertion that the Bank misallocated the payments received on behalf of EEC and finds that defendant is liable, under the Guarantee, for its Guarantee Percentage of the full indebtedness of EEC under the Revolving Credit Agreement as reflected in plaintiff's records, which percentage amounts to $820,649.56, plus such interest as has accrued since January 31, 1990, and attorneys' fees as provided for in that contract. *See supra* at 965 n. 5. However, as the amount of attorneys' fees for which defendant is liable under the Guarantee remains undetermined, entry of a final judgment pursuant to Rule 54(b), Fed.R. Civ.P., would be improper. *See Cinerama, Inc. v. Sweet Music, S.A.,* 482 F.2d 66 (2d Cir.1973).

### CONCLUSION

Insofar as defendant has failed to advance a valid defense, under New York law, to its liability under the Guarantee for the indebtedness of EEC under the Revolving Credit Agreement, plaintiff's motion for summary judgment is granted. However, because the amount of attorney's fees due plaintiff under the Guarantee with respect to this claim remains undetermined, plaintiff's request that a final judgment be entered under Rule 54(b), Fed.R.Civ.P., is denied. Plaintiff is awarded summary judgment in the amount of $820,649.56 plus such interest as has accrued since January 31, 1990, plus attorneys' fees to be determined following trial. The parties are directed to proceed with discovery and preparation of their joint pre-trial order as previously scheduled.

Settle interlocutory judgment on notice.

---

**17.** In addition, such a reading of the contract would render the Guarantee utterly superfluous in the context of the entire transaction, as Asland was already obligated under the Purchase Agreement to pay a price for the coal shipped by EEC which would be sufficient to cover all debts owed by EEC to the Bank.