188 F.3d 31 (2nd Cir. 1999)
 COMPAGNIE FINANCIERE DE CIC ET DE L'UNION EUROPEENNE; MANAGEMENT INVESTMENT FUNDING LIMITED, Plaintiffs-Appellants,
v.
MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, Interpleader-Plaintiff,
CALEX LTD., Interpleader-Defendant-Appellee
 Docket No. 98-9331
August Term, 1998
 UNITED STATES COURT OF APPEALS
SECOND CIRCUIT
 Argued: June 9, 1999
Decided: Aug. 9, 1999
 
 Appeal from a judgment of the United States District Court for the Southern District of New York (Leonard B. Sand, Judge) declaring that a letter agreement instructing interpleader-plaintiff to keep $2.5 million in securities in interpleader-defendant's account pending discharge of an underlying debt was not binding.
 Vacated and remanded.
 STEPHEN G. RINEHART, Parker Chapin Flattau & Klimpl, LLP, New York, New York, for Plaintiffs-Appellants.
 DANIEL J. KORNSTEIN, Kornstein Veisz & Wexler, LLP, New York, New York, for Interpleader-Defendant-Appellee.
 Before: LEVAL and SOTOMAYOR, Circuit Judges, and POLLACK,[1]. Senior District Judge.
 SOTOMAYOR, Circuit Judge:
 
 
 1
 Plaintiffs-appellants Compagnie Financiere de CIC et de L'Union Europeenne ("CFC") and Management Investment Funding Limited ("MIF") appeal from a judgment of the United States District Court of the Southern District of New York (Sand, J.) declaring that a letter agreement (the "Letter Agreement") did not bind interpleader-plaintiff Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch"). The letter - which was written by a guarantor, J. Alejandro Weinstock, to his investment bank, Merrill Lynch - asked Merrill Lynch to hold certain investments in escrow to secure the guarantee of an underlying loantransaction. The district court held that the letter agreement was not binding on Merrill Lynch because the guarantee secured by the Letter Agreement was discharged upon the release of the principal debtor.
 
 
 2
 This appeal presents the question whether, under New York law, a guarantee agreement containing a general waiver of defenses prevents a guarantor from being discharged of its payment obligations by virtue of the principal debtor's release. For the reasons to be discussed, we hold that it does. We therefore vacate the district court's judgment and remand for further proceedings consistent with this opinion.
 
 BACKGROUND
 
 3
 In July of 1990, Prodipe, Inc. ("Prodipe") obtained a loan (the "Loan Agreement") from CFC to develop a resort project in Mexico. Repayment of the loan was guaranteed jointly and severally by Prodipe's president and principal shareholder, Weinstock, along with Alfredo Balli and Patrick Mery-Sanson, two of Prodipe's other main officers and shareholders (collectively, the "Guarantors"). The guarantee agreement (the "Guarantee Agreement") was governed by New York law and permitted the assignment of any rights secured by the Loan Agreement. The Guarantee Agreement also granted the Guarantors subrogation rights against the borrower and contained a general waiver of defenses.
 
 
 4
 In December of 1991, Prodipe defaulted. As a result of a default on a separate investment transaction, and after the filing of the instant action, CFC ultimately acquired voting control over Prodipe. CFC then sold this voting control and the loan to Compagnie Generale de Batiment et de Construction, S.A. ("CBC"), which in turn sold both to MIF, a corporation controlled by one of the three original guarantors, Mery-Sanson.
 
 
 5
 As part of these transactions, CFC, the bank lender, CBC, the assignee of the bank, and MIF, the present owner of Prodipe's assets, released Prodipe, the borrower, and its former and current stockholders and directors "(other than Mr. Alexandro Weinstock, a Mexican citizen, and Mr. Alfredo Balli, a Mexican citizen and their respective affiliates and representatives, successors, assigns, administrators, executors, heirs, estates and legal representatives) . . . from any and all actions, . . . debts, . . . [and] guarantees . . . relating to or touching upon the [the resort project in Mexico] . . . ." (Emphasis added).
 
 
 6
 Weinstock secured his guarantee of the loan with a Letter Agreement given to assure the bank lender that he would have sufficient funds to cover the borrower's debt. This letter directed Merrill Lynch to maintain $2.5 million (the principal amount of the loan) in marketable securities held by Merrill Lynch in an account in the name of Calex Ltd. (the "Calex Account"), a company wholly owned by Weinstock. Merrill Lynch was instructed to hold these securities until either "payment in full by Prodipe of its obligations under the Loan Agreement" or receipt by Merrill Lynch of a letter or telecopy from CFC, the bank lender, authorizing the sale, transfer or other disposition of the securities.
 
 
 7
 On October 1, 1992, almost a year after Prodipe's default and shortly after a futile demand for payment from Weinstock, CFC wrote Merrill Lynch for confirmation that the $2.5 million would be maintained in the Calex account to cover Prodipe's debt, as instructed in the Letter Agreement. Merrill Lynch responded by letter dated December 11, 1992, stating that it had no contractual duty to CFC under the agreement. Merrill Lynch insisted that it was "merely an innocent stakeholder and [did] not wish to become embroiled in this matter."
 
 
 8
 On April 30, 1993, CFC brought an action in the United States District Court forthe Southern District of New York asking for a judgment "declaring that a valid and binding contractual obligation between [CFC] and Merrill Lynch exists pursuant to which Merrill Lynch may not release any funds from the [Calex] Account which would cause such account balance to fall below $2.5 million without prior receipt of permission from [CFC] to take such action from [CFC] . . . ." Merrill Lynch subsequently interpleaded Calex so that Calex and CFC could establish their respective claims with respect to the Calex Account.
 
 
 9
 On September 3, 1998, the district court issued a written opinion deciding that Merrill Lynch was not bound by the Letter Agreement. See Management Investment Funding, 19 F. Supp. 2d at 129. The court reasoned that the Letter Agreement, which purported to secure Weinstock's guarantee of the original loan, could only be binding if Weinstock, as a guarantor, was still liable for the loan after Prodipe's release. The court then held that although the Guarantee Agreement contained a broadly worded waiver of defenses, this "language . . . [did] not constitute an unbounded advance consent to the total release of the principal from all obligations." Id. at 136. In coming to this conclusion, the court expressed particular concern that the release was executed under circumstances where the lender had acquired the debtor, where the guarantors who were not released were not parties to the releasing transaction, and where the release did not expressly mention a continued right of recourse against Weinstock. Id. The court thus granted Merrill Lynch's and Calex's requests for a declaratory judgment. This appeal followed.
 
 DISCUSSION
 
 10
 As noted at the outset, this case presents the question whether, under New York law, a guarantee agreement containing a general waiver of defenses prevents a guarantor from being discharged by virtue of the principal debtor's release. After reviewing the relevant documents in this case - i.e., the release, the Guarantee Agreement and the Loan Agreement - all of which are governed by New York law, the district court answered this question in the negative. We review the court's interpretations of these documents and of New York's surety law de novo. See, e.g., Cooper v. New York Office of Mental Health, 162 F.3d 770, 773 (2d Cir. 1998); Banque Arabe et Internationale d'Investissement v. Maryland Nat'l Bank, 57 F.3d 146, 152 (2d Cir. 1995). We note that guarantee agreements are construed strictissimi juris under New York law, see People v. Stuyvesant Ins. Co., 413 N.Y.S.2d 843, 846 (Sup. Ct. 1979), and that "the court must protect the surety against a liability which is not strictly within the terms of the [guarantee] contract," id. at 847. Although this standard mandates that the "obligations undertaken by the guarantor are to be strictly applied," this application occurs only "after the meaning of the contract of guarantee has been determined according to the ordinary principles of contract construction." Banco Portugues do Atlantico v. Asland, S.A., 745 F.Supp. 962, 967 (S.D.N.Y. 1990) (citing Stuyvesant Ins. Co., 413 N.Y.S.2d at 847 (citing cases)); see also 63 N.Y. Jur. 2d, Guaranty and Suretyship, § 89 (1987) (noting that while "[t]he liability of a surety cannot be extended beyond the plain and explicit language of the contract[,] . . . a surety is not entitled to any particular tenderness in the interpretation of the language of his contract").
 
 
 11
 The general rule in New York is that a creditor's release of a principal debtor operates to discharge parties, such as guarantors, who are only secondarily liable on a debt. See, e.g., Pro-Specialties, Inc. v. Thomas Funding Corp., 812 F.2d 797, 799 (2d Cir. 1987); Jones v. Gelles, 509 N.Y.S.2d 900, 902 (App. Div. 1986). As the district court noted, however, a guarantor can consent in advance to remain liable even after such a release. See, e.g., Banco Portugues, 745 F. Supp. at 968 ("[I]t is also clear that the guarantor or surety may consent in advance, in the contract of guarantee, to modification of the underlying contract."); see also 63 N.Y. Jur. 2d, Suretyship and Guaranty, § 207 (1987) (same). This consent is expressed when, for example, a guarantee agreement contains a waiver of defenses that is broad enough to preclude the defense of release in a subsequent creditor action. See, e.g., Indianapolis Morris Plan Corp. v. Karlen, 268 N.E.2d 632, 634 (N.Y. 1971) ("'Consent may be given in advance, and is commonly incorporated in the instrument; or it may be given afterward. It requires no consideration, and operates as a waiver of the consenting party's right to claim his own discharge.'") (quoting U.C.C. § 3-606 cmt. 2); see also American Trading Co. v. Fish, 364 N.E.2d 1309, 1312 (N.Y. 1977) (holding that it is not necessarily inconsistent with the role of a guarantor to assume liability even in excess of the principal).
 
 
 12
 CFC argues that given the facts developed in this case, the waiver set forth in the Guarantee Agreement was broad enough to constitute advance consent to Prodipe's release without discharging Weinstock. We agree.
 
 
 13
 In many New York cases holding that a guarantor has waived the defense of release, the guarantees have included waivers that explicitly mention this defense. In Indianapolis Morris Plan Corp., for example, the New York Court of Appeals held that a guarantor of a mortgage on kitchen equipment remained liable after the principal's release because the promissory note stipulated that "no release of any or all of the security . . . shall release any other maker, comaker, surety, guarantor or other party hereto in any capacity." 268 N.E.2d at 633 (emphasis added). Similarly, in First American Bank v. Builders Funding Corp., 607 N.Y.S.2d 460 (App. Div. 1994), the Third Department found a guarantor liable after the principal debtor's release where the guarantee stated that its obligations would remain unaffected by "any action by the Bank to amend, extend, renew, adjust, waive or release any of the [underlying] Liabilities." Id. at 462 (emphasis added). New York courts have reached the same conclusion in cases with similar waiver language. See, e.g., Inland Credit Corp. v. Weiss, 405 N.Y.S.2d 258, 259 (App. Div. 1978) (finding waiver of release defense when guarantee authorized lender, "without notice or consent from the guarantor, to release the underlying debt and/or the collateral without in any way affecting or discharging defendant's liability as guarantor"); National Bank v. Kory, 404 N.Y.S.2d 626, 627 (App. Div. 1978) (finding waiver of release defense when "guarantee agreement explicitly authorized [lender], inter alia, to release the primary debtor and other guarantors").
 
 
 14
 Other New York cases confirm, however, that waiver of a release defense is possible even without such a specific representation. In United Orient Bank v. Lee, 637 N.Y.S.2d 96 (App. Div. 1996), for example, the First Department held that "defendants were precluded from asserting claims of release" because the guarantees waived "all defenses other than payment." Id. at 96. Similarly, in Gannett Co. v Tesler, 577 N.Y.S.2d 248 (App. Div. 1991), the court held that a guarantor waived the defense of release because, "by the plain language of the guarantee, [the guarantor] was precluded from raising any defenses or counterclaims relating to the underlying debt." Id. at 249 (emphasis added). Absolute and unconditional guaranties have in fact been found to preclude guarantors from asserting a broad range of defenses under New York law. See, e.g., Citibank, N.A. v. Plapinger, 485 N.E.2d 974, 975 (N.Y. 1985) (defense of fraud in the inducement); Chemical Bank v. Sepler, 457 N.E.2d 714, 716 (N.Y. 1983) (defense of lack of further consideration and cessation of underlying business relationship); FDIC v. Schwartz, 432 N.Y.S.2d 899, 901 (App. Div. 1980) (defense that creditor did not first seek recovery from principal debtor, that creditor was guilty of gross laches, and that guarantor specifically requested that creditor collect debt from debtor when collection was still possible); see also First New York Bank for Business v. DeMarco, 130 B.R. 650, 654 (S.D.N.Y. 1991) ("Absolute and unconditional guaranties . . . are consistently upheld by New York courts. Indeed, unconditional guaranties have been held to foreclose, as a matter of law, guarantors from asserting any defenses or counterclaims.").
 
 
 15
 In the present case, the Guarantee Agreement provided that:
 
 
 16
 [t]he Guarantors hereby agree that their obligations hereunder shall be unconditional and irrevocable, irrespective of the validity, legality or enforceability of the Loan Agreement, the absence of any action to enforce the the same, the recovery of any judgment against the Borrower, . . . or any other circumstances which might otherwise constitute a legal or equitable discharge [or] defense [of] a guarantor . . . .
 
 
 17
 (Emphases added.) The Guarantee Agreement thus waived "all legal or equitable . . . defense[s]" with a phrase similar to the "all defenses" language in United Orient Bank. The waiver also reached any defense that would relate to the underlying debt - as did the waiver in Gannett. The waiver of defenses in this case was thus broad enough to encompass release of the primary debtor.
 
 
 18
 The district court's view to the contrary rested on its interpretation of New York law as containing two competing principles governing the effectiveness of an express reservation of rights in a release. According to the district court, "[o]ne [principle] stands for the point that, where the creditor releases the principal, an express reservation will preserve his claim against the guarantor," while the other suggests "that a reservation of rights is limited in its effectiveness against a surety who is only secondarily liable." Management Investment Funding, 19 F. Supp. 2d at 135-36. The court derived this second principle from two cases, 801 South Fulton Avenue Corp. v. Victory Container Corp., 526 N.Y.S.2d 143 (App. Div. 1988), and Depositors Trust Co. v. Hudson General Corp., 485 F. Supp. 1355 (S.D.N.Y. 1980), which the court read as suggesting that "[w]here there is a modification of the agreement between lender and debtor without notice to or consent of the guarantor, the guarantor is discharged because he had a right to rely on the original underlying agreement." Management Investment Funding, 19 F. Supp. 2d at 136.
 
 
 19
 The cases relied on by the district court do not, however, support this second principle. Although the court in Depositors Trust held that a guarantor was discharged by virtue of the principal debtor's release, the guarantee explicitly required the guarantor's notice and consent prior to any release, settlement or change in the debtor's underlying obligations. See 485 F. Supp. at 1360-61. It was thus the guarantee agreement, rather than the debtor-guarantor relationship, that generated the relevant notice and consent requirements. Moreover, although the court in 801 South Fulton suggested that there is an "exception to the effectiveness of . . . an explicit reservation of rights ... when the obligee attempts to reserve such rights against an obligor which is only secondarily liable as a surety," 526 N.Y.S.2d at 144, this statement was dicta, both because the defendant was not a surety and because he was ultimately discharged. Thus, in neither of these cases did the guarantor-debtor relationship operate on its own to render a reservation of rights ineffective in a release. In fact, the agreements in 801 Fulton also lacked a general waiver of defenses. These two cases are thus even further removed from the situation in which a guarantee agreement grants advance and unconditional consent to the release of a principal debtor from a fixed debt.
 
 
 20
 The waiver of defenses in this case, by contrast, explicitly maintained Weinstock's liability even "in the absence of any action to enforce [the Loan Agreement]." Under the terms of the Guarantee Agreement, CFC could elect to forego recovery from Prodipe altogether and instead bring a suit against Weinstock, thereby leaving him with the risk of seeking indemnification from Prodipe. Cf. First New York Bank, 432 N.Y.S.2d at 901 ("In view of the . . . clear [waiver] language, [the creditor] acted properly in bringing suit against the [guarantor] without first seeking . . . recovery from [the primary debtor]."). Although CFC released Prodipe, this release did not affect Weinstock's subrogation rights under the Guarantee Agreement because, under New York law, "a release with reservations is regarded as a personal covenant not to sue the debtor, which leaves unimpaired the creditor's rights against the surety and the surety's rights against the debtor." 63 N.Y. Jur. 2d, Guaranty and Suretyship, § 258 (1987). Thus, while we agree with the district court that it "would violate traditional notions of contract law [to] expos[e] a guarantor to a risk beyond that for which he has received consideration," Management Investment Funding, 19 F. Supp. 2d at 137, we - unlike the district court - conclude that the Guarantee Agreement explicitly contemplated the risk that Weinstock might be "put in the onerous position of both standing in for the debtor (to pay) and having to chase the debtor for recovery." Id. at 137 (emphasis in original). Weinstock gave advance consent to such an arrangement, and the release created that arrangement by releasing Prodipe and all of its former and current stockholders and directors "(other than Mr. Alexandro Weinstock, . . . [and his] respective affiliates and representatives, successors, assigns, administrators, executors, heirs, estates and legal representatives) . . . from any and all actions, . . . debts, . . . [and] guarantees . . . relating to or touching upon the [the resort project in Mexico] . . . ." (Emphasis added).
 
 
 21
 We are aware that the issues in this case are complicated by the fact that CFC and MIF not only released Prodipe but took voting control over the corporation before executing the release. We can imagine circumstances in which such a process would allow a creditor to collude with a debtor, partake in a fraudulent transfer of the debtor's funds or otherwise loot the corporation so as to obtain payments from both the debtor and the guarantor while exposing the guarantor to an inflated risk of recovering nothing from the original borrower. Such a risk may be different enough in kind from those involved in an ordinary release that cases like United Orient Bank and Gannett would be inapplicable. We do not reach this issue here, however, because the district court did not make any factual findings that would suggest this kind of collusion.[2] In the absence of such findings, we see no basis to conclude that CFC's acquisition of Prodipe and its subsequent sale to MIF increased in any meaningful way the risks that Weinstock had assumed in the Guarantee Agreement.
 
 CONCLUSION
 
 22
 For the foregoing reasons, we vacate the district court's holding that the general waiver of defenses in this case was insufficient to maintain a guarantors' liability after release of the principal debtor. We note, however, that the district court did not rule on several other of Merrill Lynch's and Calex's defenses, many of which presented direct challenges to the Letter Agreement's enforceability rather than to Weinstock's guarantee obligations. We therefore vacate the district court's judgment and remand for further proceedings consistent with this opinion.
 
 
 
 Notes:
 
 
 [1]
 The Honorable Milton Pollack, District Judge of the United States District Court for the Southern District of New York, sitting by designation.
 
 
 [2]
 Although CFC obtained security interests in 99.97% of Prodipe's capital stock as early as January of 1991, it did not obtain the voting rights associated with this stock (and voting control over the corporation) until October of 1993. By that time, Prodipe had already been in default on its obligations under the Loan Agreement for almost a year and had been insolvent for approximately six months. Weinstock thus was already exposed to the full risk of having to shoulder the $2.5 million debt. In addition, CFC obtained ownership of Prodipe only because Prodipe failed to obtain sufficient investments to match another of CFC's investments in Prodipe, under a subscription agreement between the parties, and because Prodipe's parent company refused to give back this investment money, as it had agreed to do in these circumstances. Finally, although CFC sold its interests in Prodipe for less than it had originally paid, it is not clear that CFC sold these interests for anything less than fair market value, given Prodipe's financial difficulties. Of course, there may be other evidence in the record suggesting fraudulent activity, which might affect the validity or enforceability of the Letter Agreement. Nothing in this opinion should be construed as preventing the district court from developing additional pertinent facts and evidence and considering these issues on remand.