William R. Brennan, Jr., J.
These two actions seek to enforce guarantees of the indebtedness of Brillium Metals Corporation (and of the same corporation as a debtor in possession in reorganization proceedings) given by the defendants Max Freeman and Anita Freeman, his wife, and to foreclose a mortgage on their home given by them to the plaintiff to secure the guarantees.
Brillium, a manufacturer of plastic housewares and giftware, and the plaintiff had entered into an accounts receivable financing agreement and a factor’s lien agreement in 1960. When Brillium became involved in financial difficulties at the beginning of 1961, the plaintiff undertook to increase the cash that could be made available to Brillium by $35,000 and received from that corporation, as debtor in possession under Bankruptcy Act chapter 11 proceedings, a financing agreement and a factor’s lien agreement. Collateral guarantees for the existing and future indebtedness to plaintiff of Brillium independently, and as debtor in possession, were executed by the individual defendants Freeman. It was at this time (Feb. 8, 1961) that the mortgage involved in one of the instant actions was given by these defendants as collateral for their personal guarantees.
Defendants first maintain that there was a failure of consideration in that plaintiff never advanced to Brillium the sum *717 of $35,000 which it had agreed to advance at the time the mortgage was executed. This issue is resolved against the' defendants, the court finding that the full sum of $35,000 was in fact advanced to Brillium in addition to the far larger sums which had theretofore been loaned to Brillium by the plaintiff.
Defendants also contend that they have been released from-their personal guarantees by the actions of the plaintiff in connection with its disposal of the inventory of Brillium, which inventory was also given as collateral security for the corporate obligation. Defendants claim that plaintiff effectively destroyed the value of the security and, in order to determine this question, it becomes necessary to review the events which gave rise to the sale of the inventory.
By the end of 1963 it became apparent that Brillium was moribund. It was making no sales and was unable to make any payments to the plaintiff of the substantial moneys which were then due and owing. Consequently, in February, 1963, the plaintiff embarked upon a three-pronged campaign to obtain payment. First, it instituted a replevin proceeding in which it obtained possession of the Brillium inventory. Second, it instituted the mortgage foreclosure action against the individual defendants. The defendants, of course, were given notice of these proceedings. Third, it caused advertisements of a “Lien Sale to Satisfy Factors Lien ” to be published on February 21 and 28, 1963 announcing a sale of the Brillium inventory on March 1. Neither of the defendants was notified of the proposed sale.
With these preparations completed, representatives of the plaintiff met with the defendant Max Freeman on February 28 and entered into a written agreement captioned “Disposal of Inventory.”
The document stated that it relates to “ our agreement with respect to the disposal of the inventory of Brillium Metals Corporation which we have replevied.” The purpose of the agreement was stated to be “ for our mutual benefit to liquidate this inventory in an orderly fashion ’ ’; and under it the plaintiff agreed to proceed to sell the inventory ‘ in such manner and under such terms and for such prices as it, in its sole discretion, shall determine.” (Italics supplied.) Provision was made for the advance of certain sums for the processing and orderly liquidation of the inventory; and it was agreed that the plaintiff should, from the proceeds of the sale, repay itself for all amounts due and owing to it, including amounts expended in the processing and sale of the inventory, plus interest, as provided in the *718 accounts receivable financing agreement. The debtor agreed to remain liable for any deficiency, and any excess of proceeds of sale over indebtedness was to be paid to Brillium. This agreement was executed by both the plaintiff and Brillium acting by the individual defendant Max Freeman, its president. A companion agreement consented to by the debtor retained a sales agent for the purposes of selling the inventory and fixed his compensation and the terms of his employment.
At no time prior to or during the execution of the February 28 agreements did the plaintiff’s representatives inform the defendant Max Freeman that the factor’s lien sale was scheduled for the following morning, and, notwithstanding the agreements, the sale did take place at the scheduled time and the plaintiff bid in the entire inventory for the sum of $8,500.
Subsequent to March 1, Sterling began to sell the Brillium inventory at distress prices and it realized total sales aggregating $32,181.33, the bulk of this item representing sales at prices based upon only 10% of the retail value of the inventory. In this lawsuit, Sterling in an-apparently generous gesture is purporting to give credit to Brillium for $32,000 received upon the sale of its inventory (as compared with the $8,500 realized upon the lien sale). Against this figure, however, Sterling is seeking to be credited with costs of sale in excess of $13,000, and is also seeking to add interest and attorneys’ fees of almost $10,000 as a further offset to the $32,000 actually received. The gesture is that of a 10-o’clock scholar. It comes too late. Throughout the entire period from March 1, 1963 through August, 1963, when the inventory was ultimately liquidated, Sterling consistently, regularly and unequivocally, took the position that it and it alone owned the inventory by virtue of its purchase thereof for $8,500 on March 1, 1963. During this period of time it never informed the defendant Freeman of the fact that it was disposing of the inventory at 10% of retail value, nor did it inform Brillium Metals of that fact. It now attempts to convince the court that its disposition of the inventory was in accordance with the February 28 agreement and that its various sales of the inventory constituted an ‘ orderly liquidation ’ ’ of the inventory “ for our mutual benefit.” The court finds that the disposition of the inventory was not made in accordance with the February 28 agreement. If it were, the least one would expect is that Brillium and Max Freeman would have been given accounts from time to time of the amount realized on the sale, since it was for the mutual benefit of the parties. However, the fact is that Sterling steadfastly refused to give any account *719 or any information to Brillium or Freeman during the entire period of the inventory liquidation.
The equity of this holding becomes apparent when one considers the position of the parties on February 28 when the agreements were signed. Sterling had possession of, but not title to, the inventory. It had also instituted mortgage foreclosure proceedings against the defendants. It could have proceeded to judgment on the collateral guarantees and the mortgage foreclosure, without in any way disposing of the inventory (since the guarantees were of payment as distinguished from collectability). If it did so, however, the defendants, as sureties, would have been subrogated to Sterling’s rights with respect to the inventory and could have sold it for their personal account. The defendants, of course, preferred that the inventory be liquidated for the mutual benefit of Sterling and themselves before the foreclosure action proceeded to judgment, and, accordingly, signed the agreement. In doing so, they surrendered their right to be subrogated to Sterling’s claims with respect to the inventory in exchange for forbearance on the part of Sterling in foreclosing the mortgage. They did so, however, in anticipation of an ‘ orderly liquidation * * * for [their] mutual benefit ”, not in anticipation that Sterling would buy in the inventory the following day for $8,500. The effect of Sterling’s purchase was to deprive the defendants of their subrogation rights to the inventory for a sum which bore no relation whatsoever to the true value of that inventory, and no relationship whatsoever to the method of sale or the values contemplated by the agreements. (In fact, in the companion sales agent agreement the parties contemplated that sales might possibly have exceeded $50,000. They fixed sales commissions on a sliding scale of 5%% on sales up to $25,000; 71/2% on sales between $25,000 and $50,000; and 10 fo on sales in excess of $50,000.)
“ Every contract implies good faith and fair dealing between the parties to it.” (Wigand v. Bachmann-Bechtel Brewing Co., 222 N. Y. 272, 277; Grad v. Roberts, 14 N Y 2d 70, 75.) Implicit in the agreements and, indeed, in the relationship of the parties was plaintiff’s undertaking that in dealing with the inventory it would protect the interests of Brillium and of the defendants, as well as its own (Emerson Garden Elec. Co. v. Seaboard Surety Co., 23 A D 2d 624); and such an implication is required in order to give the agreements the construction which is most equitable to both parties instead of that which would give one an unfair and unreasonable advantage over the other (Fleischman v. Ferguson, 223 N. Y. 235, 241). *720 . Thus, the purchase by Sterling on March 1, 1963, the day after the February 28 agreement, was an outright repudiation of that agreement by Sterling and rendered performance under that agreement impossible. Accordingly, Sterling can no longer avail itself of the benefits conferred upon it in that agreement, and the issues in the case must be determined as if the agreement had never in fact been executed.
The holder of security (here the inventory) is not at liberty to do any affirmative act which would impair the security and so deprive the guarantors of the benefit they might derive on a proper liquidation or upon their payment under their guaranty (Humphrey v. Hayes, 94 N. Y. 594, 600). “Any improper dealing with collateral deposited to secure an indebtedness guaranteed by another is available to the guarantor as a defense ” (New Netherlands Bank v. Dernburg, 206 App. Div. 212, 213). This is because “ the entire doctrine of subrogation in surety-ship is dependent upon the immediate investment of the creditor with the obligations of a trustee whenever any rights or interests of the debtor, applicable to the debt, are placed in his control ’ ’ (Stearns, Law of Suretyship [5th ed.], p. 184), which is only -another way of saying that even though a creditor such as the plaintiff here has no duty to undertake active measures to sell security, yet if he undertakes the sale and sells at a sacrifice through negligence or otherwise, the damage resulting and the waste, if any, is chargeable to the creditor (id., p. 189; New Netherlands Bank v. Dernburg, supra).
The consequence of these rules is that there is a legal presumption that the security equals the amount of the debt (Cohen v. Rossmoore, 225 App. Div. 300, 304), and the burden of proving that the actual value of the security was less than the amount of the indebtedness is upon the creditor (id., pp. 304 and 307); and the guarantors will be discharged pro tanto to the value of the security on the date of the sale (Humphrey v. Hayes, 94 N. Y. 594).
The plaintiff has utterly failed to meet this burden. The amount of the Brillium debt was approximately $46,000. The inventory securing the debt consisted of three segments. The first segment had a value of $7,500. The second segment,. con- > sisting of items fully assembled but unpackaged, had a retail value of at least- $228,000, and it was the practice of Brillium • to sell this merchandise to wholesalers for 50% of retail value. Brillium’s offering of sale of this segment when it was moribund involved discounts substantially greater than the 50% that it customarily afforded its dealers, but even at the increased discount the assembled merchandise was valued at over $78,000. *721 The third segment was a “ mountain ” of unassembled parts, the value of which it is utterly impossible to ascertain on this record but which certainly was not valueless. Even the distress sales by Sterling resulted in a gross of $32,000, and the court is persuaded on the entire record that the full value of the inventory was in fact greater than the amount of Brillium’s indebtedness.
Accordingly, the complaint is in all respects dismissed, with costs.