CHEMICAL BANK, Respondent, v PIC MOTORS CORP. et al., Defendants, and AARON SIEGEL, Appellant.

First Department, July 1, 1982

**APPEARANCES OF COUNSEL**

*Lawrence B. Kahn* for appellant.

*Theodore M. Finkel* of counsel (*Harold Weisblatt,* attorney), for respondent.

**OPINION OF THE COURT**

FEIN, J.

PIC, an established car dealership, entered into an inventory financing agreement with plaintiff bank, pursuant to which the bank agreed to lend funds to PIC periodically under an established line of credit on the security of PIC's inventory of automobiles as collateral. Under this form of agreement, known as floor plan financing, the borrower draws upon the line of credit for the purpose of financing the purchase of automobiles for sale. The bank extends loans within the credit limit based on the value of the vehicles purchased by the borrower. Upon the sale of any vehicle, the borrower pays back the portion of the loan that was granted based on the value of that vehicle. Thus, the

bank loan always remains secured. Sales to purchasers in the ordinary course of business are made free of the bank's lien. As a matter of practice, the bank conducted periodic inspections of PIC's inventory to determine whether the financed vehicles were owned by PIC and whether the loan was reduced by an appropriate payment upon sale of a financed vehicle. The bank also followed a curtailment policy under which any loan was purportionately reduced and finally paid in full for inventory remaining unsold over specified periods of time.

Siegel had been director, president and principal stockholder of PIC for many years and had personally guaranteed the loans in writing. In 1978 Siegel sold his interest in the company to defendant Manfred Robl and resigned as an officer and director of PIC. However, it is undisputed that his guarantee continued, as agreed, during all the relevant periods of time. The guarantee reads, in pertinent part, as follows:

"NOW, THEREFORE, in consideration of the premises and of other good and valuable consideration and in order to induce the Bank from time to time, in its discretion, to extend or continue credit to the Borrower, the *undersigned hereby guarantees, absolutely and unconditionally,* to the Bank *the payment of all liabilities of the Borrower to the Bank of whatever nature, whether now existing or hereafter incurred,* whether created directly or acquired by the Bank by assignment or otherwise, whether matured or unmatured and whether absolute or contingent (all of which are hereinafter collectively referred to as the 'Liabilities of the Borrower'). * * *

"The undersigned hereby consents that from time to time, before or after any default by the Borrower or any notice of termination hereof, *with or without further notice to or assent from the undersigned, any security* at any time held by or available to the Bank for any obligation of the Borrower, or any security at any time held by or available to the Bank for any obligation of any other person secondarily or otherwise liable for any of the Liabilities of the Borrower, *may be exchanged, surrendered or released* and any obligation of the Borrower, or of any such other person, *may be changed, altered, renewed, extended, continued,*

*surrendered, compromised, waived or released in whole or in part* \* \* \* and *the Bank* \* \* \* *may extend further credit in any manner whatsoever to the Borrower,* and generally deal with the Borrower or any such security or other person as the Bank may see fit; *and the undersigned shall remain bound under this guaranty notwithstanding any such exchange, surrender, release, change, alteration, renewal, extension, continuance, compromise, waiver, inaction, extension of further credit or other dealing.*

"The undersigned hereby waives (a) notice of acceptance of this guaranty and of extensions of credit by the Bank to the Borrower; (b) presentment and demand for payment of any of the Liabilities of the Borrower; (c) protest and notice of dishonor or default to the undersigned or to any other party with respect to any of the Liabilities of the Borrower; (d) all other notices to which the undersigned might otherwise be entitled; and (e) any demand for payment under this guaranty.

"This is a guaranty of payment and not of collection \* \* \*

"nor in any event shall any modification or waiver of the provisions of this guaranty be effective unless in writing nor shall any such waiver be applicable except in the specific instance for which given." (Emphasis added.)

In July, 1979 the bank informed Siegel that PIC was "out of trust". More than 50% of the inventory was unaccounted for. Pursuant to an understanding with the bank, Siegel arranged for the sale of the remaining inventory and partial repayment was made. Following demand, the bank instituted suit for the balance against PIC and the individual guarantors, including Siegel. Siegel appeals from the summary judgment granted against him as guarantor.

By way of defense, Siegel asserts that the deficiency was caused by the failure of the bank to conduct regular inspections and to enforce its curtailment policy. He further alleges that two of the bank's employees, either negligently or in complicity with Robl, submitted incorrect or false inventory reports and approved loans on nonexistent automobiles. Siegel asserts that he was assured, as a condition of his continuing guarantee upon his sale to Robl, that

regular inspections and enforcement of the curtailment policy would continue. He asserts that the activities of the bank and its employees impaired the value of the collateral, thus relieving him from liability.

Siegel argues there is a triable issue as to whether the bank was obligated to conduct regular inspections and enforce the curtailment program, and whether the dishonesty or negligence of the bank's employees operated to impair the collateral and thus discharge his obligation as guarantor.

It is undisputed that there is no provision in the inventory financing agreement or in the guarantee obligating the bank to conduct inspections or to maintain the curtailment policy. The guarantee is a fully integrated unambiguous contract which by its terms could not be modified or varied by parol or by an alleged course of conduct. The guarantee expressly provides, in pertinent part:

"This is a guaranty of payment and not of collection and the undersigned further waives any right to require that any action be brought against the Borrower or any other person or to require that resort be had to any security * * *

"No delay on the part of the Bank in exercising any rights hereunder or failure to exercise the same shall operate as a waiver of such rights; no notice to or demand on the undersigned shall be deemed to be a waiver of the obligation of the undersigned or of the right of the Bank to take further action without notice or demand as provided herein; nor in any event shall any modification or waiver of the provisions of this guaranty be effective unless in writing nor shall any such waiver be applicable except in the specific instance for which given."

Thus neither the alleged prior course of conduct nor the alleged promise that it would be continued could modify the obligation of Siegel as guarantor of payment (*General Phoenix Corp. v Cabot,* 300 NY 87, 92; General Obligations Law, § 15-301, subd 1).

Siegel expressly consented that the "security at any time held by or available to the Bank * * * may be exchanged, surrendered or released * * * and the undersigned [defen-

dant Siegel] shall remain bound under this guaranty notwithstanding any such * * * release, * * * compromise, * * * inaction, extension of further credit or other dealing." It is plain that the bank had the right to release the collateral without discharging the guarantor. If so, the negligence or dishonesty of the bank's employees in so doing is irrelevant.

As Special Term ruled, the negligence or dishonesty of plaintiff's employees patently would not be deemed within the scope of their authority. Siegel was an unconditional guarantor of payment, not of collection, and the guarantee was not dependent upon any condition precedent other than the nonpayment of the indebtedness.

The dissent relies upon section 3-606 of the Uniform Commercial Code which provides in part:

"(1) The holder discharges any party to the instrument to the extent that without such party's consent the holder * * *

"(b) unjustifiably impairs any collateral for the instrument given by or on behalf of the party or any person against whom he has a right of recourse."

That section applies to commercial paper, negotiable instruments, not to a guarantee such as that here involved (Uniform Commercial Code, § 3-102, subd [1], par [e]; *Indianapolis Morris Plan Corp. v Karlen,* 28 NY2d 30, 32). Moreover, as that case holds respecting consent to release of collateral: " 'Consent may be given in advance, and is commonly incorporated in the instrument; or it may be given afterward. It requires no consideration, and operates as a waiver of the consenting party's right to claim his own discharge.' " (28 NY2d, at p 34, quoting Comment 2 to Uniform Commercial Code, § 3-606.)

In *Indianapolis Morris Plan Corp. (supra),* the lender consented to the substitution of gas consuming equipment for the mortgaged electrical cooking equipment. The debtor failed and the gas company repossessed the substituted equipment on which it had a seller's lien. The collateral security was dissipated by the substitution and the repossession of the substitute. The consent to release of security provided for in the promissory note operated to

prevent the discharge of the sureties although they had no notice of these events and had not consented thereto.

Our case stands on the same footing. The consent to release of security was broad and all encompassing so as to preclude discharge of the guarantor. Under the terms of this guarantee there was no obligation to preserve and protect the collateral. The dissent's reliance upon *Executive Bank of Fort Lauderdale v Tighe* (66 AD2d 70) is misplaced. That case holds only that pursuant to section 3-606 of the Uniform Commercial Code, a guarantor's waiver of the obligation not to impair collateral will not excuse the creditor's failure properly to file the security instrument as required by law, unless the waiver expressly so provides. That issue is not here involved. (See *Lafayette Bank & Trust Co. of Suffern v Silver*, 58 Misc 2d 891.)

Similarly, *Federal Deposit Ins. Corp. v Marino Corp.* (74 AD2d 620), relied upon by the dissent, is not applicable. In that case the collateral was in the possession of the creditor who negligently failed to liquidate it upon the guarantor's demand. The guarantor could not be chargeable with the decline in value of the collateral. In our case the collateral was in the possession of the debtor, not the creditor, and Siegel, as guarantor, was afforded the opportunity to liquidate it, which he did.

For the same reason, *Sterling Factors Corp. v Freeman* (50 Misc 2d 715), relied upon by the dissent, is inapposite. In that case the creditor had replevied the collateral and purchased it at a price far less than its worth, without notice to the guarantors. It then proceeded to sell the collateral at a higher price without giving credit to the guarantors. This was a blatant fraud, held to preclude any recovery against the guarantors. This has nothing to do with our case, where the bank never had possession of the collateral.

Under the express terms of the guarantee here involved, the bank could release or surrender the collateral without notifying or discharging Siegel. It could also extend further credit to PIC on an unsecured basis without notifying or releasing Siegel. Hence the complained of actions of the bank's employees are of no aid to Siegel. We must "take the

guaranty as we find it as the surest way of determining the rights of these parties." (*Corn Exch. Bank Trust Co. v Gifford,* 268 NY 153, 158.)

Nothing in the agreements or in the Uniform Commercial Code provides for the release of Siegel as unconditional guarantor of payment under the circumstances. In the face of the guarantee as written there was no duty upon the creditor to preserve or protect the collateral. Where the collateral is in the possession of the debtor, inaction by the creditor, negligent or otherwise, does not release a guarantor who has executed such a waiver. A surety may waive any obligation upon the part of a creditor, including the obligation of the creditor not to impair the security (*Indianapolis Morris Plan Corp. v Karlen, supra*). The parties, by agreement, may determine the standards by which the fulfillment of the rights and duties of the secured party may be measured (Uniform Commercial Code, § 9-501, subd [3]).

Accordingly, the order of the Supreme Court, New York County (HELMAN, J.), entered on August 12, 1980 granting plaintiff summary judgment against defendant Aaron Siegel in the sum of $189,717.17, should be affirmed, with costs.

MILONAS, J. (dissenting). I would reverse and remand for further proceedings.

This is an appeal from an order, entered on August 12, 1980, in the Supreme Court, New York County (HELMAN, J.), which granted summary judgment in favor of plaintiff against defendant PIC Motors Corp. in the sum of $161,755.11 and against defendant Aaron Siegel in the sum of $189,717.71.

Defendant-appellant Siegel was the principal stockholder, director and president of defendant PIC Motors Corporation (PIC), an established car dealership. In 1978, he sold his stock interest in the business to defendant Manfred Robl and resigned his various positions in the business, although he continued for a short period as a part-time consultant. During Siegel's 16-year operation of PIC, he had been in the practice of financing his inventory of automobiles through local banks, including that of

plaintiff, through a system known as "floor planning" whereby periodic loans are made with the inventory serving as collateral. Siegel's credit record was an excellent one throughout his dealings with plaintiff. As protection against the devaluation of its security, the bank had conducted regular monthly inspections of defendant's inventory of used cars and had also insisted upon a curtailment policy under which any loan had to be paid in full on inventory remaining unsold for specific periods of time.

When defendant Robl assumed full control of the dealership, plaintiff refused to continue to extend credit without the personal guarantee of Siegel, which he agreed to furnish. According to Siegel, he relied upon the bank's assurances that the customary safeguards to ensure preservation of the security would be maintained. In addition to Siegel, his wife, defendant Robl and Robl's wife also signed personal guarantees. The inventory financing agreement was thus executed, but in July of 1979, not long afterwards, Siegel was advised that PIC was "out of trust" and more than 50% of the inventory was not accounted for. Although Siegel arranged for the bulk sale of the remaining inventory and partial repayment was made, an amount in excess of $150,000 was still owing. Following due demand, the balance remained outstanding, and the bank instituted suit against PIC and the individual guarantors.

A motion was made by the plaintiff for summary judgment, at which time Siegel discovered that the reason for the deficiency was a plan whereby two of the bank's employees, acting in complicity with Robl, had submitted false inventory reports and approved loans on nonexistent automobiles. Siegel thereupon asserted this scheme as an affirmative defense in his answer, along with counterclaims against plaintiff and cross claims against Robl.

The court below granted summary judgment against Siegel and PIC. On appeal, Siegel contends, *inter alia,* that the activities of plaintiff creditor created a question of fact as to whether the bank impaired the value of the collateral, thus relieving him from liability.

The guarantee which Siegel signed contains the following provisions: "The undersigned hereby consents that from time to time, before or after any default by the

Borrower or any notice of termination hereof, with or without further notice to or assent from the undersigned, any security at any time held by or available to the Bank for any obligation of the Borrower, or any security at any time held by or available to the Bank for any obligation of any other person secondarily or otherwise liable for any of the Liabilities of the Borrower, may be exchanged, surrendered or released and any obligation of the Borrower, or of any such other person, may be changed, altered, renewed, extended, continued, surrendered, compromised, waived or released in whole or in part, or any default with respect thereto waived, and the Bank may fail to set off and may release, in whole or in part, any balance of any deposit account or credit on its books in favor of the Borrower, or of any such other person, and may extend further credit in any manner whatsoever to the Borrower, and generally deal with the Borrower or any such security or other person as the bank may see fit: and the undersigned shall remain bound under this guaranty notwithstanding any such exchange, surrender, release, change, alteration, renewal, extension, continuance, compromise, waiver, inaction, extension or further credit or other dealing."

Section 3-606 of the Uniform Commercial Code states that "(1) The holder discharges any party to the instrument to the extent that without such party's consent the holder * * * (b) unjustifiably impairs any collateral for the instrument given by or on behalf of the party or any person against whom he has a right of recourse." See, also, *Executive Bank of Fort Lauderdale v Tighe* (66 AD2d 70) for the proposition that, absent the consent of the surety, the surety would be discharged by the creditor's impairment of the collateral.

Under the express terms of the agreement between Siegel and the bank, the undersigned purportedly undertook to remain bound regardless of any compromise to the security. However, where the bank's negligence has, in contravention of section 9-207 of the Uniform Commercial Code, resulted in a breach of its duty to preserve and protect the collateral, a waiver "will not be enforced so as to bar a viable setoff or counterclaim sounding in fraud" or where "based upon the creditor's negligence in failing to

liquidate collateral upon the guarantor's demand" (*Federal Deposit Ins. Corp. v Marino Corp.*, 74 AD2d 620, 621). As the court therein explained, to enforce such a waiver provision when there is a triable issue of fact as to the creditor's negligence would enable a creditor to shield itself from its own tortious conduct.

"The holder of security (here the inventory) is not at liberty to do any affirmative act which would impair the security and so deprive the guarantors of the benefit they might derive on a proper liquidation or upon their payment under their guaranty" (*Sterling Factors Corp. v Freeman,* 50 Misc 2d 715, 720). In the instant case, whether the bank can be held liable for the tortious acts of its employees presents a clear issue of fact such as to render summary judgment inappropriate. To maintain that a guarantor will always be bound on the underlying obligation, notwithstanding any negligent, fraudulent or tortious conduct on the part of the creditor, simply by the expedient of the creditor's inserting a clause to that effect in the agreement is to undermine completely the spirit of the Uniform Commercial Code and is, in my opinion, contrary to public policy.

SANDLER, J. P., and LUPIANO, J., concur with FEIN, J.; BLOOM and MILONAS, JJ., dissent in an opinion by MILONAS, J.

Order, Supreme Court, New York County, entered on August 12, 1980, affirmed. Respondent shall recover of appellant $75 costs and disbursements of this appeal.