MANAGEMENT INVESTMENT FUNDING LIMITED and Compagnie Financiere de CIC et de L'Union Européenne, Plaintiffs,

v.

MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, Defendant/Interpleader–Plaintiff,

v.

CALEX, LTD., Interpleader–Defendant.

No. 93 CIV. 3004 (LBS).

United States District Court, S.D. New York.

Sept. 3, 1998.

Parker Chapin Flattau & Klimpl, LLP by Stephen G. Rinehart and Martin Weisberg, New York City, for Plaintiffs.

Brown & Wood by Henry Minnerop, New York City, for Defendant/Interpleader Plaintiff.

Kornstein Veisz & Wexler, LLP by Daniel J. Kornstein and Michael W. Atleson, New York City, for Third–Party Defendant.

## OPINION

SAND, District Judge.

There has been tried to the Court a declaratory judgment action brought by Plaintiffs, Management Investment Funding Limited ("MIF")[1] and Compagnie Financiere de CIC et de l'Union Européene ("CFC") (collectively "Plaintiffs"), against Defendant Merrill, Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") and Third–Party Defendant, Calex, Ltd. ("Calex"). This action is brought under a grant of diversity jurisdiction, 28 U.S.C. § 1332(a)(1) (1982), and implicates commercial questions under New York law. Plaintiffs seek a declaration of the continued existence of a binding contractual obligation between Plaintiffs and Defendant pursuant to which Merrill Lynch may not release any funds in the Calex Investment Account[2] which would cause the balance to fall below $2.5 million dollars. Defendant Merrill Lynch seeks a declaration that this contractual obligation is no longer binding.[3] The real dispute in this case is between Plaintiffs and Third–Party Defendant, Calex, a limited company wholly owned by Mr. Alejandro Weinstock.[4] The controversy arises over a loan made by Banque de l'Union Européene (BUE), now known as CFC,[5] to Prodipe, Inc. ("Prodipe") and unconditionally guaranteed by Mr. Weinstock. It is this Guarantee[6] which undergirds the agreement between Calex and Merrill Lynch.

There is a conflict, not fully resolved, in the cases of the New York Court of Appeals as to what happens to a surety when, as is the case here, the primary obligor is released from his obligations and there has been a waiver of defenses in the original guarantee agreement but no reservation of rights in the release. We find that the doctrine of *strictissimi juris* and the cumulative circumstances in this case tilt the balance in favor of Weinstock. The release of the primary obligor by means of an arrangement to which the guarantor did not consent and to which he was not a party; the failure to reserve rights against the guarantor in the release despite a reservation in the form of a general waiver in the original guarantee agreement; the mere exclusion of the guarantor from the scope of the release without an explicit reservation; the participation of one of the three guarantors in orchestrating the exclusion of the other two from the release; the failure to preserve expressly in the release the guarantor's right of recourse or subrogation against

1. After some dispute over the inclusion of MIF as a plaintiff to this action, it was resolved at trial that MIF, as assignee of the rights of CFC, could appropriately be added without the need for additional discovery. (Transcript of Trial Proceedings of June 15, 1998 ("Tr.") at 1–7.)

2. Investment Account No. 240–97072 held by Merrill, Lynch, Pierce, Fenner & Smith on behalf of Calex, Ltd. Though the Guarantee had been executed by Weinstock personally, for tax purposes, the Calex account was used.

3. For additional background, see also the Court's ruling of October 8, 1997 denying Third–Party Defendant's Renewed Motion for Summary Judgment. *Compagnie Financiere v. Merrill Lynch*, 1997 WL 626393 (S.D.N.Y.1997) (LBS).

4. Litigation between these parties is ongoing in Mexico.

5. CFC was previously called Banque de l'Union Européene and it is under this name that the Loan Agreement was executed. In the language of the Loan Agreement, this lender, however, is referred to as the "Bank."

6. For purposes of this Opinion, we use "Guarantee" interchangeably with "Surety."

the principal; and the acquisition of control over the borrower by the lender thereby increasing the risk to the guarantor and potentially impairing his right of subrogation— all these circumstances together give rise to the conclusion that the Weinstock Guarantee is not enforceable. The agreement with Merrill Lynch to hold the funds in the account was intended to provide a source of readily accessible capital to implement the Guarantee and its collectability. Without an enforceable guarantee, however, Merrill Lynch's obligations are without purpose and therefore not binding. In sum, we conclude that Merrill Lynch is not bound.

The following constitutes our findings of fact, which are, in large part, undisputed and stipulated, as well as our conclusions of law.

## BACKGROUND

In 1987, Alejandro Weinstock, a Mexican citizen[7] and resident of Mexico, together with Patrick Mery–Sanson ("Mery–Sanson") and Alfredo Balli ("Balli"), formed the Unis Group, Inc. ("Unis"). Unis, in turn, was the owner of record of 99.9% of the stock of Prodipe, a Cayman Islands limited corporation. Prodipe was structured as a holding company whose principal subsidiary, Consorcio Prodipe, S.A. de C.A. ("Consorcio"), managed a resort project in Mexico. (See Pre–Trial Order at ¶2 and Calex Post–Trial Br. Ex. A., "Chart of Prodipe's Corporate Structure.") Weinstock, a chartered public accountant, was, at this time, Chairman and Treasurer of Unis, Prodipe, Consorcio and of Consorcio's operating subsidiaries. However, Weinstock resigned as Treasurer and Director of Prodipe in 1993.

On July 23, 1990, Prodipe entered into a loan agreement (the "Loan Agreement") pursuant to which BUE loaned Prodipe $2.5 million (the "Loan") in connection with the Mexican resort project. (Pre–Trial Order at ¶4; Pls.' Trial Ex. 1.) At the same time, Weinstock (and his colleagues Balli and Mery–Sanson) executed and delivered to BUE a guarantee of the Prodipe Loan (the

"Guarantee"). (Pls.' Tr. Ex. 2.) The Guarantee provides, in relevant part, that:

> The Guarantors hereby agree that their obligations hereunder shall be unconditional and irrevocable, irrespective of the validity, legality or enforceability of the Loan Agreement, the absence of any action to enforce the same, any waiver or consent by the Bank with respect to any provisions thereof, the recovery of any judgment against the Borrower or any action to enforce the same or any circumstances which might otherwise constitute a legal or equitable discharge [or] defense [of] a guarantor. . . . This Guatantee [sic] shall continue in full force and effect until all amounts due in principal, interest and any obligations payable as aforesaid of or in respect of the Loan Agreement shall be paid in full and shall be valid to any assignee of the rights and benefits under the Loan Agreement.

Under the Loan Agreement, the Guarantors retained a right of subrogation against the borrower. (Pre–Trial Order at ¶6.)

By means of an undated letter ("Letter Agreement") drafted prior to the Loan Agreement (Pre–Trial Order at ¶10), Weinstock, on behalf of Calex, delivered the following instruction to Merrill Lynch:

> On behalf of Calex, Ltd., I hereby instruct you, at the request of and for the benefit of Banque de L'Union Europeene ("BUE"), not to sell, trade, transfer or otherwise dispose of any readily marketable securities held for the account of Calex, Ltd. if such sale, trade, transfer or other disposition (individually or in the aggregate) would result in reduction in the value of the Calex, Ltd. account maintained with you below the amount of $2,500,000 unless you first receive a letter or telecopy from BUE authorizing such a sale, transfer, or other disposition.

The Letter Agreement goes on to provide: "In no event shall this letter of instruction have any further force or effect following payment in full by Prodipe of its obligations

---

**7.** Though the Guarantee itself recites that Mr. Weinstock is an American citizen, he claims that this is a mistake. (Weinstock EBT at 42–53.) The 1996 Release of Prodipe, among other documents, refers to him as a Mexican citizen. (Third–Party Def.'s Trial Ex. R.) In addition, Mr. Weinstock is also known as Alejandro Weinstock Kletzel. (Third–Party Def.'s Trial Ex. AA.)

under the Loan Agreement."[8] (Pls.' Trial Exs. 4 & 8.) The agreement to maintain the minimum level of funds in the Merrill Lynch account was offered as an inducement to BUE to make the Loan.[9]

Prodipe defaulted on the Loan when it fell due on December 31, 1991. By letter of August 19, 1992, CFC demanded repayment on the Guarantee from Weinstock. (Pls.' Trial Ex. 31.) To date none of the principal of the loan has been repaid. (Pre–Trial Order at ¶ 12.) In 1996, CFC, by a series of transactions, sold the right, title and interest in the Prodipe Loan, Loan Agreement and the Guarantees, first to Compagnie Generale de Batiment et de Construction ("CBC"), which in turn assigned their interests to MIF and two other buyers. (Pre–Trial Order at ¶ 15.) It is not disputed that the Guarantee's validity survives assignment.[10] Previously, in 1993, CFC, by virtue of a pledge agreement entered into two years prior with the Unis Group, acquired control of 99.97% of the shares of Prodipe. (Pls.' Trial Exs. 36, 37, 38.) Therefore in 1996, CFC was able to sell and transfer the shares of Prodipe to MIF (Third–Party Def.'s Trial Exs. M & N) in addition to the Loan and the Guarantee. MIF and the other buyers executed a General Release ("Release") of Prodipe under the Loan. (Third–Party Def.'s Trial Ex. R.) The language of the Release reads in relevant part as follows:

> ...THE RELEASOR, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, does hereby irrevocably and unconditionally release and forever discharge PRODIPE INC., a corporation organized under the laws of the Cayman islands ("Prodipe") and HOLIDAY SERVICES, INC., a Delaware corporation ("Holiday Services"), and all of their respective subsidiaries and affiliates and their respective former and current stockholders, directors, officers, employees, principals, agents and attorneys and their respective predecessors, successors, assigns, administrators, executors, heirs, estates and legal representatives (other than Mr. Alejandro Weinstock, a Mexican citizen, and Mr. Alfredo Balli, a Mexican citizen, and their respective affiliates, representative[s], successors, assigns, administrators, heirs, estates and legal representatives)...

The third guarantor, Mr. Mery–Sanson, was released by virtue of the failure to exclude him from the Release.

## DISCUSSION

The action before us is governed by the law of New York as per the express language of the Loan Agreement and the Guarantee. *Chemical Bank v. Layne,* 423 F.Supp. 869 (S.D.N.Y.1976) (court will look to New York law for resolution of the issues involved in an action on a guaranty where the guaranty itself provides that New York law governs). This is undisputed.

It is also uncontested that Weinstock became liable on the Guarantee when Prodipe defaulted on the Loan. The question is whether any subsequent event, in particular the April 1996 Release, extinguished his obligations.[11] The central legal issue for resolu-

---

**8.** Though the Letter Agreement speaks of termination upon "payment in full" by Prodipe, we understand "payment" to refer logically to payment or satisfaction of the Loan Agreement. Plaintiffs similarly refer to payment or satisfaction as the event triggering termination of the Letter Agreement. (Pls.' Post–Trial Mem. at 11.) Because the Letter Agreement will terminate upon satisfaction or payment, we reject Calex's argument that this Agreement constitutes a "perpetual obligation" and is therefore void.

**9.** This account did not constitute securitized collateral as such but a source of accessible and liquid assets in the event that the Guarantee would be payable. The language of the Letter Agreement evinces the clear intent of the parties to have the Letter Agreement implement the Guarantee. We read the two documents together.

**10.** The parties agree that assignment of the Loan and the Guarantee is valid in principle and does not render them voidable. However, it is disputed whether the 1996 assignment, whereby the lender came to control the debt, the borrower and the guaranty affects the validity of the Guarantee.

**11.** The central issue here is the construction of an unambiguous contract of guaranty. Both parties would have us inquire into other transactions not at issue in this litigation and not fully developed on the record. We decline to examine them (e.g. the management of Prodipe's affairs subsequent to Weinstock's resignation) as to do

tion before the Court is whether the release of the principal debtor also serves to release the guarantor where there has been a waiver of defenses in the language of the Guarantee. Alternatively, we have been asked to rule on the issue of whether an entity's acquisition of the borrower *and* of the loan agreement and guarantee extinguishes the obligations of the guarantor to that loan; i.e., renders the guarantee unenforceable by virtue of a potentially increased risk and impaired right of subrogation against the borrower, who is now alleged to be the lender as well.

The Third–Party Defendant makes five contentions to support its main argument that the Calex/Weinstock Guarantee is unenforceable and that the Court ought to declare Merrill Lynch not contractually bound to maintain the funds in the investment account: (1) The Guarantee was discharged, Calex argues, by Plaintiffs' release of Prodipe in 1996 inasmuch as Plaintiffs failed to preserve explicitly Weinstock's recourse against Prodipe and thereby impaired his right of subrogation; (2) New York law does not recognize a reservation of rights against a guarantor in the face of a general release of the debtor; (3) The various sale and assignment transactions in the instant case served to alter the credit relationship and the level of risk thereby discharging the Guarantor; (4) Even if Weinstock and Calex paid out on the Guarantee to MIF, they would have a right of subrogation against Plaintiffs (the so-called "going around in a circle" argument, see Tr. of August 8, 1996 at 23.); (5) Finally, Defendants argue that, even if for none of the above reasons, the Guarantee should still be nullified because "the letters themselves are unenforceable on their face" and constitute a means to obtain a "backdoor security interest and attachment without following statutory guidelines." (Calex Post–Trial Br. at 2–3.)

Plaintiffs raise five counter-arguments, namely that: (1) The Guarantee is valid and enforceable on its face; (2) CFC's ownership of the stock of Prodipe, in addition to the loan, did not extinguish the Guarantee; (3) No discharge has occurred because Weinstock has expressly waived all traditional

suretyship defenses; (4) Calex has not demonstrated that the Guarantor's rights were in any way impaired by the various assignments; and (5) Finally, Calex has not established that Weinstock is entitled to subrogation from Prodipe nor, they argue, are the liabilities of Weinstock and Prodipe squarely before the Court.

We conclude that the Guarantee is no longer binding and cannot be used to enforce Merrill Lynch's obligations pursuant to the Letter Agreement. Our reasoning follows.

*Burden of Proof*

■ Generally speaking, the lender-obligee in an action against the guarantor bears the burden of proof of all the essential elements of the cause of action. However, the defendant-guarantor has the burden of proving any affirmative defenses which may affect the guarantor's obligations in an action based on facts arising after the execution of the contract. *American Exchange Irving Trust Co. v. Siegel*, 229 A.D. 453, 242 N.Y.S. 366(1930). Since the central contention here is that events subsequent to the execution of the Guarantee and Loan Agreements rendered the Guarantee unenforceable, either by virtue of the Release or other changed circumstances, the burden of proof here shifts to the Guarantor.

*The Effect of the Release*

There is no dispute that the Guarantee became due upon the default of Prodipe, the debtor. We are called upon to construe the language of the Guaranty Agreement and the subsequent Release of Prodipe, the primary debtor, in order to determine whether, under New York law, Weinstock's obligations as guarantor have been discharged or whether the reservation of rights, in fact, has preserved his liability.

The case before us is a close one, both because of its complex facts and because there is no clear rule of law emanating from the New York Court of Appeals. Calex argues that New York law should be read to say that a creditor's release of the principal discharges those secondarily liable on the debt. (Calex Post–Trial Br. at 15.) Specifi-

so would be outside the scope of the case and unnecessary to its disposition.

cally, Third–Party Defendant argues that the release by the lender and his assigns of Prodipe, the primary debtor, served to discharge Weinstock's obligation. Furthermore, Calex asserts that the language of the Release is inadequate to reserve rights against the Guarantor regardless of the wording of the Guarantee itself. Conversely, Plaintiffs contend that any such "suretyship defenses" do not apply where the guarantor has consented in advance to any modification of the loan agreement, including a release of the principal obligor, by means of a waiver in the original Guarantee Agreement. (Pls.' Post–Trial Mem. at 15.) The language of the Guarantee to which they point reads in relevant part:

> The Guarantors hereby agree that their obligations hereunder shall be unconditional and irrevocable, irrespective of the validity, legality or enforceability of the Loan Agreement, the absence of any action to enforce the same, any waiver or consent by the Bank with the provisions thereof, the recovery of any judgment against the Borrower or any action to enforce the same or any circumstances which might otherwise constitute a legal or equitable discharge [or] defense [of] a guarantor.

■ We are guided in reading the express language of the Guarantee by the principle under New York law that, "[t]he liability of the surety cannot be extended beyond the plain and explicit language of the contract . . . , [and] a surety is not entitled to any particular tenderness in the interpretation of the language of the contract." The obligation of a surety is to be construed *strictissimi juris*. *Banco Portugues do Atlantico v. Asland*, 745 F.Supp. 962 (S.D.N.Y.1990) (surety discharged by alteration of underlying contract unless modification consented to in advance); *Depositors Trust Co. v. Hudson General Corp.*, 485 F.Supp. 1355 (E.D.N.Y. 1980) (strict construction). Similarly, "[t]he meaning and coverage of a general release depends on the controversy being settled and upon the purpose for which the release was actually given. . . A release may not be read to cover matters which the parties did not desire or intend to dispose of . . ." *Enock v. National Westminster Bankcorp, Inc.*, 226 A.D.2d 235, 641 N.Y.S.2d 27 (App.Div.1996)

(mem.); *National Helicopter Corp. of America v. City of New York*, 137 F.3d 81 (2d Cir.1998). In other words, we must try to give accurate effect to the intended obligations of the parties—no more, no less.

■ The question we must decide is whether the final phrase of the Guarantee, "legal or equitable discharge [or] defense [of] a guarantor" preserved Weinstock's obligations even after Prodipe's release. Generally, as a matter of New York law, a naked release of the principal without more discharges the surety. *Pro–Specialties, Inc. v. Thomas Funding Corp.*, 812 F.2d 797 (2d Cir.1987) (guarantor cannot be liable for debt unless principal debtor is liable on principal obligation); *Jones v. Gelles*, 167 A.D.2d 636, 562 N.Y.S.2d 992 (App.Div.1990); 10 Samuel Williston, *A Treatise on the Law of Contracts* § 1220 (3d Ed.1967).

Our inquiry is complicated by the reservation of rights—phrased as a waiver of defenses—against the guarantor in the original Guarantee and a subsequent Release of the principal obligor (without a release of the guarantor). The Release does not contain an express reservation of rights or preservation of recourse; it simply excludes Weinstock as Guarantor from its purview.

■ There are two competing trends in the New York case law. One stands for the point that, where the creditor releases the principal, an express reservation will preserve his claim against the guarantor. Even where there is no express reservation of rights in the release but only in the original guarantee agreement, the release of the primary debtor does not discharge the obligation of the surety. *National Bank of N. Am. v. Kory*, 63 A.D.2d 579, 404 N.Y.S.2d 626, 627 (App.Div.1978) ("[W]e have come to the view that the section [15–105(1) of the General Obligations Law of New York] is not applicable to bar action against a remaining guarantor where the guarantor has consented in the guarantee agreement to the release of the debtor and other guarantors."); 10 Samuel Williston, *A Treatise on the Law of Contracts* § 1230 (3d Ed.1967). The discharge of the primary obligor, where the surety has consented to the discharge, trig-

gers the full liability of the guarantor and transforms him from one secondarily liable to one primarily liable on the debt. Though generally a coexistent relationship, it is not inconsistent with the role of guarantor for the surety to assume liability in excess of that of the principal where such greater obligation is consented to or contemplated. *American Trading Co. v. Fish,* 42 N.Y.2d 20, 396 N.Y.S.2d 617, 364 N.E.2d 1309 (N.Y. 1977). Plaintiffs cite numerous cases to bolster this contention, however, these are largely inapposite to the case at bar because they do not involve the issue of release. See, e.g., *Chemical Bank v. PIC Motors Corp.,* 87 A.D.2d 447, 452 N.Y.S.2d 41 (App.Div.1982), *aff'd,* 58 N.Y.2d 1023, 462 N.Y.S.2d 438, 448 N.E.2d 1349 (1983) (alleged conduct of primary debtor did not modify the obligation of guarantor where guaranty fully integrated and unambiguous); *Banco Portugues do Atlantico v. Asland, S.A.,* 745 F.Supp. 962 (S.D.N.Y.1990) (surety not discharged where advance consent to alteration of underlying contract); *National Bank v. Koehler,* 204 N.Y. 174, 97 N.E. 468 (1912) (extension of time for repayment does not discharge surety).

 The other point of view competing for application is that a reservation of rights is limited in its effectiveness against a surety who is only secondarily liable. *801 South Fulton Avenue Corp. v. Victory Container Corp.,* 138 A.D.2d 561, 526 N.Y.S.2d 143 (App.Div.1988) ("The only exception to the effectiveness of such an explicit reservation of rights is when the obligee attempts to reserve such rights against an obligor which is only secondarily liable as a surety.") An unconditional cancellation of the principal contract releases a surety. Where there is a modification of the agreement between lender and debtor without notice to or consent of the guarantor, the guarantor is discharged because he had a right to rely on the original underlying agreement. *Depositors Trust Co. v. Hudson General Corp.,* 485 F.Supp. 1355 (S.D.N.Y.1980). This doctrine is strengthened by the statutory rule under the General Obligations Law of New York, which states that the discharge of one or more of several obligors requires a reservation of rights to be part of the same transaction as the release itself. N.Y. Gen Oblig Law §§ 15–104 (McKinney 1989).

Here we have a situation where, unlike in *Kory,* Third–Party Defendant did not consent in 1996 to the Release of Prodipe. The Release contained no explicit preservation of recourse against Prodipe, the obligee. Weinstock was not a signatory to the Release. (Third–Party Def.'s Trial Ex. R.) The one of the three guarantors, Mery–Sanson, who was included in the release, participated in orchestrating the release. Hence we must ask whether the waiver language of the original Guarantee constituted an adequate reservation of rights to satisfy the proposition that the surety is not discharged where the surety consents to the release of the primary debtor.

 We find that the language in the Guarantee does not constitute an unbounded advance consent to the total release of the principal from all obligations. *Cf., National Bank of N. Am. v. Kory,* 63 A.D.2d 579, 404 N.Y.S.2d 626 (App.Div.1978). The Guarantee contemplates "validity, legality or enforceability of the Loan Agreement, the absence of any action to enforce the same, any waiver or consent by the Bank...or any other circumstances which might otherwise constitute a legal or equitable discharge of defense or a guarantor." Such legal defenses could include, *inter alia,* the insolvency of the principal, the latter's incapacity or the invalidity of the loan agreement for fraud or duress. The blanket language used in this Release however, does not extinguish the guarantor's rights to challenge the validity of the Guarantee for any and all purposes. Though the waiver of defenses language can and should be brief, the rule of *strictissimi juris* must still be heeded to define the rights and responsibilities of a guarantor.

As the discussion in the Restatement of Law, Third, Suretyship and Guaranty (1996)[12] elucidates, the lender, debtor and

---

**12.** Though this Restatement has not yet been adopted in New York, it provides helpful illumination of the subject matter at issue.

guarantor have logical roles—roles which have become somewhat muddied by inconsistent case law. Cases in this area, invariably grounded in fact-specific and often complex commercial arrangements, suggest contradictory outcomes for situations involving a reservation of rights against a guarantor. We pause, therefore, to assess the essential purpose of the guaranty arrangement under New York law in order to understand better the liabilities of the parties in this case with its unusual fact-pattern (i.e., the lender owns the borrower and the guarantee). The purpose of the guaranty is to create a relationship of secondary liability and to make the lender whole in the event of non-payment by the primary debtor. However, the guaranty agreement should not be used to transform the guarantor into either a primary lender or a primary debtor. In other words, the guarantor should not be put in the onerous position of *both* standing in for the debtor (to pay) and having to chase the debtor for recovery when he has not consented to the release and has been harmed by it in a manner not contemplated in the original agreements. Even where the guarantor's rights of subrogation are reserved, this does not necessarily mean that the guarantor has not been harmed by the release. In other words, a guarantor, like a party to any contract, is entitled to have the bounds of the original contract, as drawn at the time of execution, respected, such that his obligations thereunder are enforced but not exceeded. To impose duties upon a guarantor greater than those contemplated at the time of contracting or later consented to would violate traditional notions of contract law by exposing a guarantor to a risk beyond that for which he has received consideration. A guarantor's role—unless otherwise explicitly agreed—is to stand in for the debts of the primary obligor, when the obligor cannot pay the obligee, and subsequently, having paid out on those obligations to the obligee, to be repaid. This contemplates the risk that the primary obligor cannot pay and that the guarantor might have to pay. It also contemplates the risk that he might not be able to secure full repayment from the primary obligor. It does not traditionally refer to the case where the primary obligor is *released*

from the obligation to pay and the guarantor must pay. This could greatly increase the level of risk that the guarantor faces. The law of suretyship surely does not contemplate the situation where the obligee buys the primary obligor, executes a release and then forces the guarantor to pay.

▆ In this context, the overall record evinces that Weinstock did not consent to the Release of Prodipe and he was, in fact, harmed by it. It is clear that, at the time the Loan Agreement and Guarantee were executed, the complete release of the debtor and one of the guarantors following the acquisition by the lender of the borrower could not have been contemplated. Given the totality of the circumstances in this case, we do not believe that the original Guarantee, despite the broad, yet boilerplate, language of the reservation was intended to reach the situation now before us. The language of the original Guarantee is diluted by the absence of a reservation of rights in the Release and the lack of contemporaneous consent thereto. Furthermore, the language of the Release is insufficiently specific and too remote in time to be read in conjunction with the Guarantee, which it does not expressly reference. *See Dillon v. Dean,* 236 A.D.2d 360, 653 N.Y.S.2d 639, 640 (App.Div.1997) (documents signed contemporaneously with release should be read together).

We find, on the narrow facts of this record and given the totality of the circumstances, the Release of Prodipe without Weinstock's contemporaneous consent and without an express preservation of recourse against primary debtor in the Release, renders the Guarantee unenforceable for these purposes. We base our conclusion not only on the finding that the Release in this case lacks the requisite consent and appropriate language but on our finding that the risk assumed by the Guarantor had been significantly altered, impairing his right of recourse. The devolution of Prodipe into a moribund company (see Weisberg Trial Test., Tr. at 75, Ln. 9 & Tr. at 84, Ln. 25) and the purchase by the lender of the debtor modified the underlying contractual relationship, potentially increasing the Guarantor's risk and impairing his right of subrogation in such a way as to have left

him with a risk far greater than that contemplated when the contract of Guarantee had been executed.

Our finding that the risk has been altered and the right of subrogation impaired is augmented by the finding that the lender acquired Prodipe, the borrower, around the same time as the Release. Though this finding touches upon the "going around in a circle" argument discussed previously, it does not rely upon it because that would entail factual findings regarding Prodipe's solvency, the viability of Weinstock's rights of subrogation and the relationship between the Plaintiffs and Prodipe which the record does not support. But Weinstock need not show actual harm as a result of the acquisition of the borrower by the lender where he has demonstrated that his exposure is greater than that which existed at the time of the Guarantee's execution. It contravenes economic logic to think that the risk to the guarantor has not been increased when the one secondarily liable is transformed into the one primarily liable by the original lender in cahoots with the borrower. A guarantor is required to pay the debts of the party primarily liable when this primary obligor cannot pay—for whatever reason. However, for the lender to gain control of the primary obligor and release it from its obligations—knowing of its financial straits—would transform the guarantor into the one primarily liable without any likely right of recourse. This is a substantial alteration of the original risk. This conflation of control by the lender over the borrower, the debt and the guaranty renders the attempted waiver of defenses in the Release insufficient and entirely inadequate because the Guarantor's risk has been altered beyond the contemplated scope of the original agreements. Under these circumstances, the lender cannot hide beyond a so-called waiver of all suretyship defenses. Especially here, where the so-called waiver is no more than an exclusion of the Guarantor from the Release, we find that the rights of the Guarantor have been impaired.

Under New York law, it is a settled maxim that "[w]hen the terms of the contract guaranteed have been changed or the contract, as finally made, is not the one upon which the surety agreed to become bound, he will be released." *Banco Portugues*, 745 F.Supp. at 968 (citations omitted). The case law makes clear that formalistic changes in the identity of a principal obligor do not discharge the surety. See, e.g., *Caldor v. Mattel*, 817 F.Supp. 408, 412 (S.D.N.Y.1993) (changes in a subsidiary's identity did not release guarantor from its obligation). "The appropriate inquiry focuses on the extent to which the changes in form of the entity whose debts are guaranteed significantly alter the business dealing between the principal obligor and the creditor and whether they have a potentially adverse impact on the nature of the surety's undertaking, particularly on the degree of risk the surety assumed in guaranteeing payment or performance. Pertinent to these factors are whether actual ownership or management control of the principal has been changed..." *State of New York v. International Fidelity Insurance Co.*, 152 A.D.2d 77, 80, 547 N.Y.S.2d 466, 468 (App.Div.1989). This is clearly the case here where the debtor has come under the control of the lender. Regardless of the separation of corporate forms, this inquiry relates to the substance of the transaction and does not necessitate a piercing of the corporate veil. We find that the waiver of defenses in the Guarantee does not, by itself, preserve the obligations of the Guarantor under such circumstances as are present in this case.

To support this contention, Calex cites a 1933 case, *Persky v. Bank of Am. Nat. Ass'n*, 261 N.Y. 212, 218, 185 N.E. 77 which held that "the guaranty of a payment ceases to be a contract when the promisor becomes the owner of his own promise." In *Persky* it was the payee-guarantor who reacquired his guaranty. In this case, it is the lender who has become the owner of his own debt and the guaranty. Though *Persky* is not squarely on point, it is apposite. What is at stake is control over the debtor and the ability, therefore, to modify the underlying contractual relationship between lender and debtor thereby altering the responsibilities and risk of the Guarantor.

## CONCLUSION

We do not opine here on the efficacy of a reservation of rights against a guarantor standing alone. Rather, our conclusion is based on the unique and narrow facts of this case as we have found them. Especially because this case is only indirectly about the validity of the Guarantee, we do not speak to the general topic of release. At issue in this case is not the overall liability of the parties, which we understand is being litigated in Mexico, but the status of the Calex Investment Account which supports it. The Letter Agreement in question states: "[i]n no event shall this letter of instruction have any further force or effect following payment in full by Prodipe of its obligations under the Loan Agreement." Although this language refers specifically to "payment," it is clear that the Letter Agreement cannot survive the demise of the Guarantee which it was intended to support and implement.

Therefore we find that in light of the full release of Prodipe from its obligations and, insofar as Third–Party Defendant has advanced valid defenses under New York law to the enforcement of the Guarantee as enumerated above, Merrill Lynch is not currently bound by this Letter–Agreement. Accordingly, any obligation Merrill Lynch may have had pursuant to the July 13, 1990 letter and its assignments is voided. For the reasons elucidated above, we grant Defendant and Third–Party Defendant Merrill Lynch's request for a declaration that the Letter Agreement is no longer binding and deny Plaintiffs' claim for a contrary judgment.

SETTLE ORDER ON NOTICE.